## GEORGE FRIEND & others *vs.* GLOUCESTER MUTUAL FISHING INSURANCE COMPANY.

A fishing vessel being insured with a clause prohibiting her sailing "on any voyage east of Cape Sable," after a given date, sailed, after that date, for Eastport to procure bait, and suffered loss before arrival, she being at the time, with the exception of bait, manned and fully equipped for the fishing grounds east of the Cape. In an action on the policy, *Held*, that the term "voyage" meant the enterprise begun and not the route taken; that it was for the jury to determine whether she was on a voyage to Eastport or to the fishing grounds; that if the going to Eastport was an independent voyage, not designed as a part of the fishing voyage, the plaintiffs could recover; but if the fishing grounds had been fixed upon as the end of the voyage, and the stopping for bait was but an incidental part of it, the plaintiffs could not recover.

CONTRACT to recover for a loss upon the schooner Annie Linwood, and upon her outfits, under two time policies of insurance, underwritten by the defendants, the one June 6, 1871, the other July 20, 1871.

The defence relied upon was, that the schooner when damaged was sailing upon a voyage prohibited by clauses in the policies which provided that " no vessel shall sail from the harbor of Gloucester on any voyage east of Cape Sable, after the tenth day of November next, at noon ; or on a trip to Georges after the fifteenth day of November next, at noon ; nor shall any vessel sail upon any voyage whatever after the twenty-fifth day of November next, at the risk of this company."

At the trial in the Superior Court, before *Lord*, J., the plaintiffs offered evidence that the schooner sailed from Gloucester harbor on the 13th day of November, 1871, on a voyage to Eastport in the state of Maine, for the purpose of procuring bait for a fishing voyage, which they intended to make after obtaining the bait ; that while on her voyage to Eastport, and when within about one hundred miles thereof, she was driven ashore upon Long Island, near Penobscot Bay, about twenty miles from the coast of Maine, and suffered the damage claimed under the policy.

There was evidence tending to show that the schooner at the time of her sailing from Gloucester harbor, was manned and pro-

vided with every equipment and outfit, excepting bait, suitable for a fishing voyage east of Cape Sable, with dories and with trawls, and with ice to preserve the fish that might be caught; and that her crew were shipped at Gloucester for a fishing voyage. Her master testified, that when he started from Gloucester, he meant to go east of Cape Sable. " If we got bait, I suppose we should have gone to the Western Banks; I should not have tried to fish to the westward of Cape Sable at that time of year." There was evidence that vessels going on a fishing voyage east of Cape Sable, sometimes procured their bait at Gloucester, sometimes, and in a majority of cases, at Boston, Eastport, or other places; that the plaintiffs fully expected to be able to procure their bait at Eastport, and intended to do so; that in the event of their procuring bait at Eastport, the schooner was to proceed from that place on a fishing voyage east of Cape Sable; but if she was not able to procure bait there, then she was to return to Gloucester (although one of the plaintiffs testified that no directions were given to the master, as to what he should do, if he failed to obtain bait at Eastport), and that a vessel going directly on a voyage east of Cape Sable would have pursued a different and more southerly course than that pursued by this one on her passage to Eastport.

Joseph O. Procter, president of the defendant company, testified, among other things, as follows : " November 20, 1871, there was a meeting of the company, to which Mr. Story (the secretary) brought a telegram, announcing the disaster to the Annie Linwood. On the same day, Mr. Somes (one of the plaintiffs) called at my house, and asked what we were going to do about the Annie Linwood. I asked where she was bound ? He said, ' To the Western Banks.' I asked, ' When did she sail ? ' He said, ' A week ago to-day.' I then asked, ' What was she doing up there by Long Island ? ' He said he supposed she was going to Eastport for bait. I told him she was not covered by the policy if she sailed on a voyage to the Western Banks, after November 10, and he said he was surprised to learn of this provision of the policy. I got a copy of the policy and by-laws, and read it to him."

The plaintiffs requested the court to rule as follows:

" That if the vessel, when she left Gloucester, was not fully prepared for a voyage to a point east of Cape Sable, in consequence of her having no bait, but was, when the loss happened, on a passage to Eastport for the purpose of completing her preparation by taking in bait, and which was a necessary part of the equipment, or the taking of it a necessary part of the preparation for the prosecution of her voyage to a point east of Cape Sable, and she would not, and it was not intended she should, have gone to a point east of Cape Sable without having obtained bait at Eastport, then her going towards Eastport for bait was not a violation of the prohibitions in the policies of a voyage east of Cape Sable, although she might have been in other respects fully equipped and prepared for such a voyage.

" That if this vessel started from Gloucester with the purpose of going on a voyage to a point east of Cape Sable, only in case she could obtain bait at Eastport, and the obtaining of such bait was a necessary part of the preparation for the prosecution of her voyage to a point east of Cape Sable, and she did not intend to go and would not have gone to such point unless she could have obtained and had obtained bait at Eastport, then on her passage to Eastport for bait she was not violating the clauses in the policies forbidding her sailing from Gloucester on a voyage east of Cape Sable, although she might have been in no otherwise, than want of bait, deficient in equipment or preparation for a voyage east of Cape Sable, when she left Gloucester.

" If, at the time this vessel left Gloucester, she was not fully prepared for a voyage east of Cape Sable, and the question whether she should go to a point east of Cape Sable was open so far as to depend upon her ability to procure or upon her procuring bait at Eastport, and the procuring of such bait at Eastport was a necessary part of her preparation for the prosecution of her voyage, and without it she would not have gone to a point east of Cape Sable, then her passage to Eastport, for the purpose of procuring bait and thereby completing her .preparation, was not a violation of the prohibitions in the policies of a voyage east of Cape Sable; she having been wrecked before arriving at East-

port, and there being no evidence whether she could have pro-
cured bait there or not.

" That she was not on a voyage east of Cape Sable while she
was on her passage to Eastport to procure a necessary part of her
preparation for such a voyage ; that she was not on the prohibited
voyage unless it was determined absolutely that she should go to
a point east of Cape Sable, irrespective of her being able to pro-
cure or of procuring bait at Eastport, that bait being a necessary
part of her preparation to go east of Cape Sable.

" That if her going to a point east of Cape Sable depended
upon any contingency of her being able to obtain or of her obtain-
ing bait at Eastport, that being a necessary part of the prose-
cution of her preparation to go east of that cape, her passage to
Eastport was not a violation of the policies.

" That if her going to a point east of Cape Sable depended
upon any contingency of her being able to obtain or of her obtain-
ing bait at Eastport, that being a necessary part of the prose-
cution of her preparation for a voyage east of Cape Sable, her
passage to Eastport was not a violation of the prohibitions.

" That if this vessel left the harbor of Gloucester with two
purposes — one to go to Eastport for bait, and the procuring of
bait at that place was a necessary part of the preparation for the
prosecution of her voyage east of Cape Sable — and the other
purpose was to proceed from Eastport on a voyage east of Cape
Sable, if she could procure, or after she had procured said bait,
and she would not have gone without such bait, then the plain-
tiffs are entitled to recover for the loss having occurred on her
passage to Eastport for the above purpose."

The presiding judge commenced his charge by saying, that
very voluminous prayers for instruction had been presented ;
that upon a hasty reading of them he was not prepared to say
that with a proper definition of the terms used they were not
correct, but that sometimes language was equivocal, and words
were capable of being used in different senses ; that the word
voyage, for example, was sometimes used to express simply the
idea of route, while at other times it meant the entire undertak-
ing ; that necessary preparation for a voyage, might mean those

things necessary to make the vessel in all respects seaworthy and capable of a proper performance of the voyage; or it might mean such things as were necessary for the successful accomplishment of the purposes of the enterprise; and that therefore, without deciding whether the prayers for instruction were in any sense proper to be given, he preferred to use his own language, which he intended to be clear and unequivocal, and to cover all the points necessary to the proper decision of the case, and if he should fail to state the law accurately, the party aggrieved would have his remedy.

He instructed the jury that the question in the case was what voyage the vessel was pursuing at the time of the loss. If she was pursuing a voyage east of Cape Sable, she was not protected by the policies — if not, she was; that voyage did not necessarily mean route, although often used in that sense; that the word voyage in the policies meant enterprise; that when the policies said that a vessel should not leave Gloucester on a voyage east of Cape Sable, after the 10th of November, it meant that she should not leave Gloucester on that enterprise; that the question was, Was this a voyage east of Cape Sable liable to be defeated at Eastport, or was it a voyage to be contingently continued to Cape Sable after the arrival of the vessel at Eastport? What voyage was it understood the vessel entered upon when she left Gloucester? If she left Gloucester on a voyage to Eastport, contingently to be prolonged to Cape Sable, then the plaintiffs might recover; but if she left Gloucester with full purpose of going on a voyage east of Cape Sable, liable to be defeated on her going to Eastport, then the plaintiffs could not recover. Was the vessel on a voyage in the usual course of a voyage to Cape Sable, or was she in the usual course of a voyage to Eastport? When she left Gloucester, was she pursuing the one enterprise or the other? If the plaintiffs did not show that they had kept themselves within the terms of the policy, they could not recover; and in order to do that, they must show that the vessel was not on a prohibited voyage; that if the vessel was on a voyage to Eastport, subject to the contingency of being prolonged to Cape Sable, the plaintiffs might recover; if she started on a voyage east of Cape Sable, liable to

be interrupted by going to Eastport, then the plaintiffs could not recover. No exception was taken to the ruling in regard to the burden of proof. At the conclusion of the charge no objection was taken to the instructions given, and no prayer or request for any other or different ruling was made. The verdict was for the defendants, and the plaintiffs alleged exceptions.

*J. C. Perkins,* (*C. P. Thompson* with him,) for the plaintiffs.

*S. B. Ives, Jr., & F. Goodwin,* for the defendants, were not called upon.

MORTON, J. The plaintiffs had two time policies underwritten by the defendants, one insuring them upon their interest in the schooner Annie Linwood, for the season, terminating on the thirtieth day of November, 1871, the other upon the outfits for the same time.

Each policy contains the following conditions : " that no vessel shall sail from the harbor of Gloucester, on any voyage east of Cape Sable, after the tenth day of November next, at noon ; or on a trip to Georges after the fifteenth day of November next, at noon ; nor shall any vessel sail upon any voyage whatever after the twenty-fifth day of November next, at noon, at the risk of this company."

It is clear that this clause prohibits the sailing of the vessel insured from Gloucester upon a voyage to the fishing ground east of Cape Sable, after the tenth day of November, 1871, and if she had entered upon such a voyage when damaged by the perils of the sea, she was not covered by the policies, and the plaintiffs cannot recover.

It was admitted that she sailed from Gloucester on the thirteenth day of November, 1871, and was damaged on the twentieth day of the same month.

The defence relied upon was that she was upon a voyage to the fishing grounds east of Cape Sable, prohibited by the policy.

The uncontroverted evidence showed that when she sailed, she was manned and provided with every equipment and outfit suitable for such voyage, except bait ; that her crew were shipped for a fishing voyage, and that when damaged she was on her way to Eastport, where she was to put in to procure bait. The plaintiffs

claimed that she was upon a voyage to Eastport, and so covered by the policy.

It was a question of fact for the jury whether she sailed from Gloucester on a voyage to the fishing grounds, or to Eastport. This would depend on the intentions of her owners and master when she sailed. If they had the full purpose of sending her on the adventure or enterprise of a fishing voyage to the east of Cape Sable, having fixed upon this as the terminus of the voyage, she was on a voyage to the fishing grounds, and it is not material that it was expected that in the course of the voyage she was to put into Eastport to obtain bait, even if the voyage might possibly be defeated by a failure to procure bait there. It is still a voyage to the fishing grounds, and the putting in to Eastport is merely an incident of the voyage. If this vessel had been insured upon a round voyage from Gloucester to the fishing grounds and back, the insurers could not have defended upon the ground that she had not entered upon her voyage because she was to go in to Eastport to procure bait, if it appeared that the owners had started her, fully equipped for a sea voyage, with the purpose and intent of sending her to the fishing grounds as the fixed terminus of the voyage. *Bond* v. *Nutt*, Cowper, 601. *Merrill* v. *Boylston Insurance Co.* 3 Allen, 247. *Bowen* v. *Hope Insurance Co.* 20 Pick. 275. *Hobart* v. *Norton*, 8 Pick. 159.

On the other hand, if in this case the voyage to Eastport was an independent voyage, not designed or understood to be a part of the voyage to the fishing grounds, the plaintiffs can recover.

The instructions to the jury were in accordance with these views. The presiding judge properly left it to the jury to determine what voyage the vessel was pursuing when damaged, instructing them that if she left Gloucester with the full purpose of going on a voyage east of Cape Sable, though liable to be defeated on her going to Eastport, the plaintiffs could not recover; but if a voyage to Eastport was intended, subject to a contingency of its being prolonged to the fishing grounds, the plaintiffs could recover. The statement that by voyage, in this connection, was meant the enterprise entered upon, and not merely the route, is not open to objection.

We think the instructions were sufficiently favorable to the plaintiffs, and that the jury were justified in finding that the vessel, when she sailed, intended and entered upon a voyage prohibited by tne policy. *Exceptions overruled.*