*In re* GEORGE MONCAN, *alias* AH WAH, and another.

(*Circuit Court, D. Oregon.*   October 27, 1882.)

1. TOUCHING AT A PORT OF THE UNITED STATES.
    A vessel touches at a port of the United States, within the meaning of section 3 of the act of May 6, 1882, to exclude Chinese laborers from the United States, when she calls there for orders, or a cargo for a foreign port, and Chinese laborers who are on board of her as passengers or crew, are not unlawfully in the country, contrary to said act, during her stay for such purpose.
2. CHINESE CREWS.
    The act aforesaid does not apply to Chinese who enter a port of the United States as seamen or members of the crew of a vessel arriving from a foreign port with the intention of returning or proceeding to another foreign port in the ordinary course of commerce and navigation; but if such Chinese leave the vessel while in the American port, or do not depart with her, their presence in the country becomes unlawful.
3. THE DECK OF AN AMERICAN VESSEL IS AMERICAN TERRITORY.
    A person on board of a vessel of the United States or any one or them is in contemplation of law within the territory and jurisdiction of the United States, and therefore a Chinese laborer who shipped on an American vessel at London, prior to the passage of the act aforesaid, and continued on her until her arrival in the United States, although after the expiration of the 90 days next following the passage of said act, is entitled to reside therein.

*James F. Watson,* for the United States.

*M. W. Fechheimer,* for defendants.

DEADY, D. J.   On October 25, 1882, Ah Kee and George Moncan, *alias* Ah Wah, were brought before me on warrants issued by me under section 12 of the act of May 6, 1882, "to execute certain treaty stipulations relating to Chinese," upon the charge of being unlawfully within the United States, contrary to section 1 of said act.   Upon the hearing the following facts were established and admitted:

On February 18, 1882, Moncan joined the American ship Patrician at London as cook, and on March 9th signed the articles for a voyage thereon in that capacity to Cardiff, and from thence on a general trading and freighting voyage, as the master might direct, not exceeding 24 months in duration, and back to a port of discharge in Europe or the United States; that the vessel went to Yokohama, Japan, where, on September 11th, in consequence of the steward, Ah Sing, being discharged, Moncan was made steward, and Ah Kee shipped as cook for a voyage to Astoria, Oregon, or for orders, and thence to such ports as the master might direct, not exceeding 24 months in duration; that on October 14th the Patrician entered the Columbia river, and arrived at this port on October 24th, with Moncan and Ah Kee on board as steward and cook, respectively, where they remained until removed upon the warrants issued for their arrest.   Both Moncan and Ah Kee are natives of China, and were duly shipped before the American consuls of London and Yokohama,

respectively. The Patrician belongs at Damariscotta, Maine, and is now loading with wheat for Europe, and will be ready to sail in a few days; and the master, unless prevented, expects to carry these men with him for the voyage specified in the articles.

Section 1 of the act of May 6, 1882, declares that upon the expiration of 90 days from its passage, and for a period of 10 years thereafter, "the coming of Chinese *laborers* to the United States" is suspended; and that "during such suspension it shall not be lawful for any Chinese *laborer* to come, or having so come, after the expiration of said 90 days, to remain within the United States."

By section 2 it is made a misdemeanor, punishable by a fine and imprisonment, for the master of any vessel "to knowingly bring within the United States on such vessel, and land, or permit to be landed, any Chinese *laborer* from any foreign port or place."

From the operation of these two sections the third one excepts Chinese laborers who were in the United States on November 17, 1880, or who might come therein within the 90 days next after the passage of the act; and also the case of any master bound to a foreign port whose vessel shall come within the United States "by reason of being in distress, or in stress of weather, or *touching* at any port of the United States on its voyage to any foreign port or place: provided, that all Chinese laborers brought on such vessel shall depart with the vessel on leaving port."

Section 12 provides "that any Chinese person found unlawfully within the United States shall be caused to be removed therefrom to the country from whence he came, by direction of the president of the United States and at the cost of the United States, after being brought before some justice, judge, or commissioner of a court of the United States, and found to be one not lawfully entitled to remain in the United States."

This act was passed in pursuance of the treaty with China of November, 1880, supplementary to that of July 28, 1868. Pub. Treaties, 148. By the former the right conceded to the Chinese by the latter to come to and reside within the United States at pleasure was modified so as to authorize the government of the United States, whenever in its opinion "the coming of Chinese *laborers* to the United States or residence therein affects or threatens to affect the interests of the country, to regulate, limit, or suspend the same;" but such limitation or suspension shall be reasonable, and shall apply only *to Chinese who may go to the United States as laborers*, other classes not being included in the limitations. It is not to be presumed that con-

gress, in the passage, of this act intended to trench upon the treaty of 1868 as modified by that of 1880; and therefore it is that all general or ambiguous clauses or phrases contained in the former should be construed and applied so as to make them conform to the latter. It is manifest that the concession in the supplementary treaty of 1880 was only asked and obtained by the United States for the purpose of allowing it to limit or suspend the existing right of Chinese laborers to come and be within its territory, for the purpose of laboring therein and thereby competing with the labor of its citizens for the local means of livelihood.

Counsel for the Chinese contends (1) that under the circumstances the Patrician is a vessel "touching" at a port of the United States "on its voyage" to a foreign one, and therefore within the exception contained in section 3 of the act; and (2) that the crew of a vessel arriving at a port of the United States from a foreign port or place, in the ordinary course of commerce and navigation, are not "laborers" within the meaning of the act.

When the Patrician entered the Columbia river the *terminus ad quem* or place of termination of her voyage was not definitely known. It might be either in Europe or the United States; and so far as now known it is in the former. But, even so long as it might be in either country, I think she ought to be, for the purpose of this act, considered as on a voyage to a foreign port. But it is certain that her port of final destination was not Astoria, at which place she merely called for orders. Nor had the voyage then terminated as to the steward and cook, whose engagements were for 24 months each from the date of signing the articles, unless sooner discharged. Section 4511, Rev. St. A "voyage" is not limited to the passage of a vessel from one port to another, but it may include several ports. Bouv. Law Dict. "Voyage;" 1 Parsons, Shipp. & Adm. 307. The word "touch" and its derivatives is, in a sense, a nautical phrase. It is defined thus: "To come or attain to; to arrive at; to reach; as, 'To *touch* their natal shore.'—*Pope*." And its use is illustrated as follows: "*To touch at,* to arrive at, or come to without stay, as in sailing. 'The next day we *touched* at Sidon.'—*Acts*, xxxvii, 3." Worcest. Dict. "Touch."

The word "touching" is evidently used in the act to signify the opposite of "staying." And it does not apply to the case of a compulsory entrance on account of distress or stress of weather, for that is specifically provided for. A vessel does not ordinarily touch at her home port, but remains there until a new voyage is undertaken. But in course of a trading voyage from England to Asia and back to Europe

or the United States, she may touch at many ports, and for many purposes. Calling at a port for orders is, in my judgment, a plain case of "touching" at such port; and if, in pursuance of the order obtained or being there, the vessel remains long enough to take in a cargo for a foreign port, I see no reason, under the circumstances, for concluding that she is thenceforth "staying," but not "touching," at such port. Upon this view of the case the Patrician has simply touched at this port. Her stay here is only temporary, and for an object necessary to enable her to prosecute a voyage to a foreign port with profit to her owners. Nor do I think that the Chinese members of the crew of the Patrician are "laborers" within the meaning of this act. True, their vocation is labor. But they are not brought here to remain and enter into competition with the labor of the inhabitants of the country. They labor upon the high seas in the navigation of a vessel engaged in the exchange of commodities between this country and other parts of the world.

This commerce it is the direct interest of both the labor and the capital of the country to foster and promote. In a note to the opinion of Mr. Justice FIELD, *In the Matter of Low Yam Chow*, 10 Pac. C. Law J. 135, [S. C. 13 FED. REP. 611,] it is stated, upon the authority of the Chinese consul, that the value of the commodities exchanged between China and the United States in the year of the Burlingame treaty (1868) was $15,365,013; while for the year ending June 30, 1881, they had reached $27,765,409; being a gain of almost 100 per centum in 13 years. When this treaty was concluded the export of flour at the port of San Francisco was about 20,000 barrels a year, while in 1881 it had reached 271,118 barrels —90 per centum of which was shipped by Chinese merchants.

It is not to be supposed for a moment that congress intended by the passage of this act to impede or cripple this commerce by prohibiting, in effect, all vessels engaged in the carrying trade to and from the United States, and particularly those on the Pacific coast, from employing Chinese cooks, stewards, or crews, when, for any reason, it is necessary or convenient to do so; for such would necessarily be the result of holding that the Chinese crew of a vessel coming from a foreign port to one of the United States are "laborers," within the meaning of the act. Such a "limitation" upon the right of the Chinese to enter or be brought within our ports is clearly beyond the letter and spirit of the concession made by the supplemental treaty, which declares that it shall only apply "to Chinese who may go to the United States as *laborers;*" that is, with the intention to labor

here and enter into competition with the labor of the country. Upon this ground, also, it is clear to my mind that the act does not apply to the crew of the Patrician. Of course, a Chinese seaman, although allowed to come into the ports of the United States as one of the crew of a vessel from a foreign port, does not thereby obtain the right to remain in the country and become a laborer therein; and if the master allows him to go ashore permanently, the latter would be liable to removal, and the former to the punishment prescribed in section 2 of the act. But such seaman would have the same right to be on shore temporarily and not otherwise employed than in the business of the vessel during her stay in port, as those of other nationalities.

Counsel for Moncan also claims that the act does not apply to him at all, and that he is entitled now to remain in the United States, as a laborer, because he was lawfully on board of an American vessel as a member of the crew thereof after November 17, 1880, and before the passage of the act, where he has ever since remained. The rule is well established that the vessels of a nation are to be considered as a part of its territory, and the persons on board of them are deemed to be within the jurisdiction and are protected and governed by the laws of the country to which such vessel belongs. Vattel, book 1, *c.* 19, § 216; Wheat. Internat. Law, 157; 1 Kent, 28; *Crapo* v. *Kelly*, 16 Wall. 611.

*In the Matter of Ah Sing,* 10 Pac. C. Law J. 52, [S. C. 13 FED. REP. 286,] Mr. Justice FIELD says:

"An American vessel is deemed to be a part of the territory of the state within which its home port is situated, and as such a part of the territory of the United States. The rights of its crew are measured by the laws of the state or nation, and their contracts are enforced by its tribunals."

For many purposes, in contemplation of law, Moncan has been within the territory and jurisdiction of the United States ever since he sailed from England on the Patrician, and I think this ought to be considered one of them. He joined the crew of an American vessel, bound for a port in the United States, before the passage of the act, and while in that condition is brought within the actual territorial limits of the country. To drive him back now from our shores as as a person prohibited by this act from residing within the United States, would, it seems to me, be giving it a narrow and harsh construction, utterly at variance with the spirit and intent of our treaty stipulations.

This act may be enforced so as, for all practical purposes, to exclude Chinese laborers from coming here and entering into competition with the labor of the inhabitants of the country, without spitefully straining it to cover a few doubtful or extreme cases, and thereby eventually bringing it into deserved odium and disrepute. Nor should it be forgotten by those who favor the exclusion of Chinese laborers from the country, and wish to see the experiment fairly tried, that the act is unfavorably regarded by a large portion of the most intelligent and influential people of the country "as being the servile echo of the clamors of the sand lot—as fraught with danger to our commercial relations with China, as inconsistent with our national policy, as obstructing the spread of Christianity, and as violative, not only of the treaty, but of the inherent rights of man." HOFFMAN, D. J., *In re Low Yam Chow,* 10 Pac. C. Law J. 140; [S. C. 13 FED. REP. 616.]

My conclusion is that neither Moncan nor Ah Kee are unlawfully in the country, within the perview of the act of May 6, 1882, because (1) they are simply on board of a vessel "touching" at this port while on a voyage to a foreign one; (2) they are here only as members of the crew of a vessel arriving from a foreign port and taking on cargo for another; and, further, that Moncan, having joined an American ship prior to the passage of the act, and remained on her until his arrival here, is not thereby prohibited from residing in the country.

The prisoners are discharged from the arrest, and the marshal is directed to return them to the vessel from which they were taken.