## In re LA BOURGOGNE.

(District Court, S. D. New York. March 22, 1902.)

**1. SHIPPING—LIMITATION OF LIABILITY—"VOYAGE" DEFINED.**

Where a steamship was engaged in making regular trips across the Atlantic from Havre to New York and return, each trip between the two terminal ports constitutes a "voyage," within the meaning of the statute providing for limitation of liability of owners to their interest in the vessel "and her freight for the voyage" (Rev. St. § 4284); and the owner, in instituting proceedings thereunder for limitation of liability for claims arising out of the sinking of the ship in collision while on her way from New York to Havre, is not required to deposit the freight earned on the preceding trip from Havre to New York.

**2. SAME—CONSTRUCTION OF STATUTE.**

The construction of the statute as applied to such case cannot be affected by the fact that in a contract for carrying mails, between the ship and the French government, a round trip was designated as a voyage.

**3. SAME—PROCEEDING FOR LIMITATION OF LIABILITY—SURRENDER OF PENDING FREIGHT.**

By the terms "freight pending" and "freight for the voyage," as used in Rev. St. §§ 4283, 4284, is meant the earnings of the voyage, dependent or contingent on its completion, whether for the carriage of passengers or merchandise; and where the vessel is lost before the voyage is completed, so that she earns neither passage money nor freight, the owner is not required to make any deposit on account thereof in a suit for limitation of liability, although both passage money and freight were paid in advance under contracts which provided that the money should be the property of the carrier whether the vessel were lost or not lost.

**4. SAME—RIGHT TO LIMITATION—CARRYING INSUFFICIENT NUMBER OF BOATS.**

The owner of a steamship is not debarred from maintaining proceedings for limitation of liability on account of claims arising from her loss at sea on the ground that she was at the time violating Rev. St. § 4488, requiring all steamers to be provided with such number of lifeboats, etc., as will best secure the safety of all persons on board in case of disaster, where, although she did not have sufficient boats to carry all persons on board, she had complied with all of the requirements of the board of inspectors, and received their certificate to that effect, and carried such number of boats as the inspectors determined would best secure the safety of all persons on board, because a greater number would interfere with her management, and create an additional danger.

**5. STEAMSHIPS—COLLISION—EXCESSIVE SPEED IN FOG.**

Evidence considered, and *held* to show that the steamship La Bourgogne was in fault for the collision with the British ship Cromartyshire, by which she was sunk off Sable Island in a fog, in failing to reduce her speed to a point of safety after she encountered the fog.

**6. SHIPPING—LIMITATION OF LIABILITY—PRIVITY OF OWNERS.**

A steamship company, which in good faith makes rules and regulations requiring the officers of all vessels to maintain only a moderate speed during foggy weather, and take all the precautions required by the international rules to prevent collisions, and exercises due diligence and care in the selection of competent officers, is not debarred from the right to a limitation of its liability for damages caused by a collision for which its vessel was in fault by reason of maintaining excessive speed in a fog, even though it had knowledge that such rules were habitually violated in that respect, where it appears to have done all that could practically be done to secure their enforcement.

¶1. Limitation of shipowner's liability, see note to The Longfellow, 45 C. C. A. 387.

**7. ADMIRALTY—JURISDICTION—MARITIME TORTS CAUSING DEATH.**
    There can be no recovery of damages, under the general maritime law, for negligence resulting in death on the high seas.

In Admiralty. Petition for limitation of liability.

Edward K. Jones, for petitioner.

Benedict & Benedict, William H. Button, A. Gordon Murray, Harold Binney, Hastings & Gleason, Kenneson, Crain, Emley & Rubine, G. J. Wiederhold, Alexander & Colby, Morris Putnam Stevens, Frank L. Eckerson, Townsend & Mann, Judson G. Wells, George Sanders, E. W. Powers, William R. Page, Wilbur & Ludlow, Bullowa & Bullowa, and G. T. Goldthwaite, for claimants.

TOWNSEND, District Judge. On petition for limitation of liability. On July 2, 1898, the steamship Bourgogne, of the Compagnie Generale Transatlantique, cleared Sandy Hook at 12:45 p. m., bound for Havre, France, with 714 persons on board. At about 5 o'clock on the morning of July 4th she collided off Sable Island with the British ship Cromartyshire. A dense fog prevailed at the time, and the collision occurred almost immediately after the vessels sighted each other. The Cromartyshire first struck the Bourgogne's boat No. 1 with her jibboom, and then struck the Bourgogne on the starboard side a little forward amidships, crushing her plating, cutting a deep hole in her side, breaking in four of her compartments, and disabling other boats. La Bourgogne at once commenced to list so heavily as to seriously interfere with efforts to lower lifeboats, and, in spite of all efforts made, she sank in about half an hour. Forty-four passengers and 120 of the crew were saved. Various actions having been brought for loss of life and property, La Compagnie Generale Transatlantique, on May 15, 1900, filed its petition for limitation of liability, and made a transfer by order of court to a trustee. The claimants herein contest the right of the petitioner to such limitation on the following grounds:

"(1) The petitioner has not complied with the law and the rules of practice in its proceeding, in that it has never delivered to the trustee the freight pending for the voyage in question. The petitioner should be compelled to deliver such freight, with interest thereon from July 4, 1898, to the trustee, before any further proceeding is taken in the case. (2) The petitioner, by reason of its course of conduct in this proceeding, is not entitled to any favorable consideration from the court, and all presumptions should be drawn against it. (3) The steamer Bourgogne was in fault for the collision with the Cromartyshire, because she was not navigating at a moderate speed in the fog, as required by law. (4) The steamer Bourgogne was being navigated by the petitioner without having complied with section 4488 of the Revised Statutes of the United States, in that: (a) She did not have on board such a number of lifeboats and rafts as would 'best secure the safety of all persons on board.' (b) Her lifeboats were not fitted with boat-disengaging apparatus arranged as required by the above-mentioned section. (5) The said collision did not occur without the privity or knowledge of the petitioner, but the petitioner was itself in fault in the matter, in that: (a) It had not made sufficient regulations to insure that the captains of its steamers should run them at a moderate speed in fog, as required by law. (b) It had knowledge that divers of the captains of its ships ran the ships at an excessive speed in fog, notwithstanding the regulation which it had

¶ 7. See Admiralty, vol. 1, Cent. Dig. § 218.

made; and it took no measures to prevent their continuing so to do, and made no other regulation. (c) If it had no such knowledge, it was negligent, in that it failed to obtain such knowledge, while it had abundant means of obtaining it. (d) It failed to have the Bourgogne furnished and equipped as required by section 4488 of the Revised Statutes."

1. As to the first point,—that the petitioner has not delivered to the trustee the freight pending for the voyage. The statutory provisions bearing on this point are as follows:

"Sec. 4283. The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, lost, damage, or forfeiture, done, occasioned, or incurred, without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

"Sec. 4284. Whenever any such embezzlement, loss, or destruction is suffered by several freighters or owners of goods, wares, merchandise, or any property whatever, on the same voyage, and the whole value of the vessel, and her freight for the voyage, is not sufficient to make compensation to each of them, they shall receive compensation from the owner of the vessel in proportion to their respective losses; and for that purpose the freighters and (owner) (owners) of the property, and the owner of the vessel, or any of them, may take the appropriate proceedings in any court, for the purpose of apportioning the sum for which the owner of the vessel may be liable among the parties entitled thereto.

"Sec. 4285. It shall be deemed a sufficient compliance on the part of such owner with the requirements of this title relating to his liability for any embezzlement, loss, or destruction of any property, goods, or merchandise, if he shall transfer his interest in such vessel and freight, for the benefit of such claimants, to a trustee, to be appointed by any court of competent jurisdiction, to act as such trustee for the person who may prove to be legally entitled thereto; from and after which transfer all claims and proceedings against the owner shall cease."

In admiralty rule 54 the freight to be surrendered in such proceedings is referred to as "freight for the voyage." The petition averred that the pending freight was "a total loss." Claimants contended that petitioner's interest therein amounted to about $55,000, and applied to the court for an order for the payment thereof to the trustee, but said question appears to have been reserved for further consideration. Said $55,000, claimed as freight, includes the money collected for carriage of cargo and passengers on the trip from New York to Havre and ¹/₅₂ part of the compensation received from the French government for carrying mails for a year. Claimants insist that the terms "freight pending," in section 4283, and "freight for the voyage," in section 4284, are synonymous, and that the word "voyage" included the round trip from Havre to New York and return. They therefore contend that the petitioner should deliver to the trustee the sum which it received for freight and passage money on the preceding passage from Havre to New York, and on the passage on which the disaster occurred, on the ground that these passages constitute one voyage. In support of this contention claimants quote from the contract between the owners and the French government, and the law under which it was made, as follows:

"The service to be performed includes a weekly line from Havre to New York, or fifty-two voyages, going and returning. The distance to go is 31,300 miles per crossing, and 62,600 miles per voyage, going and returning. * * *

At the end of each annual period comprising the total of fifty-two voyages going and returning, there shall be prepared a summary of the results of each crossing."

They insist that "voyage" and "crossing" should not be given the same signification. It may be true that in litigation based upon the contract of carriage the petitioner would be bound by its interpretation of the term "voyage" in the contract. Thus, in actions on insurance policies containing limitations as to voyages undertaken, the question of the intention of master and owner as to the enterprise entered upon are material as to the voyage. Paddock v. Insurance Co., 11 Pick. 227, 231; Friend v. Insurance Co., 113 Mass. 326. But it is not clear how such interpretation is relevant in the determination of the extent of the limitation of liability under the act. This act was intended to provide a general rule whereby a shipowner might measure his responsibility for loss in certain cases. As the supreme court said in The Main, 152 U. S. 122, 14 Sup. Ct. 486, 38 L. Ed. 381: "The real object of the act in question was to limit the liability of vessel owners to their interest in the adventure." This liability alone he assumes when he becomes a part owner, and, in the absence of waiver on his part, it should not be extended to include other adventures merely because an agreement entered into between shippers and shipping agents provides that for the purposes of some particular engagement or employment a round trip or a certain number of trips shall be considered a voyage. " 'Voyage' is a term of recognized meaning in common parlance, and has received a legal interpretation accordingly." Valente v. Gibbs, 28 Law J. C. P. 234. See 1 Pars. Shipping & Adm. pp. 307, 308; In re Moncan, 8 Sawy. 353, 14 Fed. 44. In proceedings to limit liability it has been repeatedly held that the freight to be surrendered is the freight pending for the particular trip or journey. Thus, in The Alpena, 8 Fed. 283, Judge Blodgett says:

"It seems to me that each voyage or trip, each separate journey, which the ship makes from one port to another, must be treated as a separate venture, involving its own particular hazards, losses, and earnings. * · * * The owner, freighters, and passengers on any particular voyage may be said to have a common interest for that voyage. They may be compelled to contribute for jettisons made for the common safety under certain circumstances. But there is nothing in common between the freighters and passengers of different voyages."

And he held in this case that each daily trip constituted a voyage, and that they could not be grouped together. In The Rose Culkin (D. C.) 52 Fed. 332, Judge Brown cites this case with approval, and, taking the same view, holds that each trip constitutes a voyage. In The Mary Adelaide Randall (D. C.) 93 Fed. 222, the writer had occasion to collect some of the definitions of "voyage," and there held that the word in its maritime sense meant the transit at sea from one terminus to another; and the court of appeals, affirming the judgment, speaks of a voyage as signifying in its strict sense the "actual transit of the vessel from port to port." 39 C. C. A. 335, 98 Fed. 895. In The Giles Loring (D. C.) 48 Fed. 472, Judge Webb held:

"By the charter party one-half of the freight was earned and payable on right delivery of the outward cargo from Boston to the west coast, and that half was accordingly paid. The other half was freight pending when the voyage terminated, and would be earned only on delivery of the cargo at its destination, before which it was of no value to the owners. The City of Norwich, 118 U. S. 491, 6 Sup. Ct. 1150, 30 L. Ed. 134. As that portion of the freight was never earned, nothing is to be added on its account to the value of the vessel, for the purpose of showing the amount of the owners' liability."

The object of the statute would be defeated if owners were to be held liable for the amount of freight prepaid on previous passages or trips, because, as between shipper and shipowner, the contract had stipulated that the successive trips should be treated as a single voyage. The money paid for the crossing from Havre to New York did not constitute any freight which the petitioner was bound to deposit.

As to the claim that compensation from the French government for the crossing from New York to Havre, during which the vessel was lost, should be included in the freight, there is no evidence that the owners received any compensation for this crossing, or that the mails may not have been carried by some other steamer.

Counsel for claimants contend that, as the freight money and passenger fares had been paid in advance, and as the passage tickets and bills of lading provided that prepaid freight and passage money should be the property of the steamship company whether the vessel were lost or not lost, such money cannot be recovered back, and that, even if such had not been the agreement, the passengers and shippers could only claim their pro rata share in common with other claimants. And they insist that in any event the petitioner should have surrendered the freight and passage money paid for the pending trip from Havre to New York. Counsel for the petitioner, on the other hand, contends that the provisions in the passage tickets and bills of lading that prepaid freight and passage money shall be the property of the steamship company whether the vessel be lost or not lost excludes such money from the category of "pending freight." That the passage money is included under the term "freight" is expressly decided in The Main, supra. The question of freight is an interesting one, and, as no precedents have been cited by counsel on either side, it is probably novel, and must be decided as a matter of first impression. What construction is to be given to the term "pending freight" in the statute? The freight money was not actually earned under the ordinary rules of law. The petitioner claims that this prepaid money has in fact been returned to the parties who paid it, or to their representatives. But claimants, with apparent reason, maintain that, if these parties were not legally entitled to receive it, and it is properly included in the statutory term "pending freight," such payment does not operate to relieve petitioner from its obligation to pay such freight into court. The natural meaning of the words "pending freight" is freight dependent or contingent on the completion of the voyage. Until the voyage is completed, it is not earned. That part of the contract which provides that it should not be returned, even in cases of loss, is more nearly like a contract of insur-

ance than of affreightment. Substantially, the passengers and shippers insure the owners against loss to the extent of the money thus paid, but not earned. But the owners are not obliged to surrender insurance money in order to limit liability. The City of Norwich, 118 U. S. 468, 6 Sup. Ct. 1150, 30 L. Ed. 134. The term "pending freight" has been generally used in the cases in the sense of freight to be earned by the carriage of the specific goods or passengers on board the vessel at the time of the loss. Thus, in The City of Norwich, supra, the supreme court says:

"Pending freight is of no value to the shipowner until it is earned; and it is not earned, if earned at all, until the conclusion of the voyage. * * * If, however, by reason of the loss or sinking of the ship, the voyage is never completed, but is broken up and ended by causes over which the owners have no control, the value of the ship (if it has any value) at the time of such breaking up and ending of the voyage must be taken as the measure of the owners' liability. In most cases of this character no freight will be earned."

And in The Main, supra, it is said that the property to be assessed comprises "whatever is on board for the object of the voyage belonging to the owners, whether such object be warfare, the conveyance of passengers, goods, or the fisheries." The court further says:

"The words 'freight pending,' in section 4283, or 'freight for the voyage,' in section 4284, were copied from the English statute of George II, which, in turn, were copied from the Marine Ordinance of 1681, and the prior continental codes; but in both cases they were evidently intended to represent the earnings of the voyage, whether from the carriage of passengers or merchandise. If these words were used instead of the words 'freight for the voyage,' it would probably more accurately express the intent of the legislature."

And in The Abbie C. Stubbs (D. C.) 28 Fed., at page 720, Judge Nelson holds as follows:

"When a shipowner sends his ship to sea, so far as his liability for collisions and other losses happening through the fault of those in charge of her, and without his privity or knowledge, is concerned, he puts at risk only his ship, the expense of navigating her, and the freight she may earn on the voyage. His responsibility is limited to the capital embarked in the adventure, and the profit he may gain from it in the form of freight, or its equivalent. If the ship is sunk or destroyed, and no freight earned, his whole responsibility is at an end. If either or both are saved, in whole or in part, to that extent his liability remains. The words 'her freight then pending,' as used in section 4283, must at least include freight earned at the end of the voyage for cargo on board at the time of the collision, which is this case."

He holds that certain demurrage on the passage, when the voyage terminated, is of the character of freight pending, and that such freight during the voyage or charter in the performance of which the losses were caused by the master, should be surrendered.

Crump, in his work on Marine Insurance and General Average, says: "To constitute freight a contributing interest, it must have been pending at the time of the sacrifice."

It seems most consonant with the tenor of the foregoing decisions that, unless the freight and passage money are pending in the sense that they are earned as the result of the maritime adventure, they do not fall within the terms of the statute. The case of The Main,

supra, cited by counsel for claimants, does not sustain their contention, because in that case the voyage was completed and the freight earned.

2. La Bourgogne had 714 persons on board, while her lifeboat and raft capacity would provide for only 658. Claimants contend that the ship was in actual violation of a statutory rule, and therefore, within the doctrine laid down in The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148, the burden is thrown upon her of showing that such violation could not have been one of the causes of the disaster. Sections 4488 and 4489, Rev. St., provide as follows:

"Sec. 4488. Every steamer navigating the ocean, or any lake, bay, or sound of the United States, shall be provided with such numbers of life-boats, floats, rafts, life preservers, and drags, as will best secure the safety of all persons on board such vessel in case of disaster; and every sea-going vessel carrying passengers, and every such vessel navigating any of the northern or northwestern lakes, shall have the life-boats required by law, provided with suitable boat-disengaging apparatus. so arranged as to allow such boats to be safely launched while such vessels are under speed or otherwise, and so as to allow such disengaging-apparatus to be operated by one person, disengaging both ends of the boat simultaneously from the tackles by which it may be lowered to the water. And the board of supervising inspectors shall fix and determine, by their rules and regulations, the kind of life-boats, floats, rafts, life-preservers, and drags that shall be used on such vessels, and also the kind and capacity of pumps or other appliances for freeing the steamer from water in case of heavy leakage, the capacity of such pumps or appliances being suited to the navigation in which the steamer is employed.

"Sec. 4489. The owner of any such steamer who neglects or refuses to provide such life-boats, floats, rafts, life-preservers, drags, pumps, or appliances, as are, under the provisions of the preceding section, required by the board of supervising inspectors, and approved by the secretary of the treasury, shall be fined one thousand dollars."

It appears from the testimony of Gen. Dumont, the supervising inspector of steamboats, and of the assistant inspector, that La Bourgogne was duly inspected March 29, 1898, and that she complied with all the requirements imposed by said inspectors, and duly received a certificate to that effect. The "rules and regulations" of the board of inspectors leave the question of what is required in each case largely to the judgment and discretion of said board. It appears from the testimony of Dumont, the supervising inspector, that she was provided with such sufficient number of lifeboats as would best secure the safety of all on board, because she could not carry more boats without interfering with the management of the ship, and thus creating more danger than would result from the lack of boats. And the assistant inspector, Wilmurt, testified that she had all the lifeboats, life-rafts, life-saving appliances, and life-preservers necessary under the law. I understand that it is admitted that section 4493, on which great stress is laid by counsel for the claimants, is not applicable to foreign vessels.

Counsel for the claimants further contend that La Bourgogne was not provided with proper boat-disengaging apparatus. This contention is chiefly supported by the testimony of two witnesses interested in a patent releasing hook. It appeared, however, that this hook had been rejected as impracticable by various boards of steam-

boat inspectors, and that it had not been introduced into general use on other steamers. The supervising inspector of steamboats says that he knows of no device capable of satisfying the requirements of the statute, and that, therefore, the local board of inspectors have made the law practically effective by requiring all such vessels to have detaching hooks, which are absolutely safe, and as good a device as can be used, and that this is the ordinary block and fall and hook, such as was used on La Bourgogne. These contentions of claimants are not proved.

3. The question of speed at the time of the collision has been much discussed and considered. In the English admiralty court it was found that La Bourgogne was in fault for excessive speed, and that the Cromartyshire was not in fault. The French court of appeals and court of cassation held that La Bourgogne was free from fault, and that the collision was caused by the faulty navigation of the Cromartyshire. The evidence tends to prove that the proper officers were on deck, and attentive to their duties, up to the time of the collision; so that there is no imputation of negligence except in the matter of speed. About 4 o'clock in the morning the steamer encountered a dense fog, which prevailed at the time of the collision. The siren was blown regularly from some time after 4 o'clock. A number of witnesses, including Corre, the steersman of La Bourgogne, Laisne, the fourth engineer, Fortin, a fireman, Seol, the second purser, and several of the crew of La Bourgogne, testify that she was slowed down at the time of the collision. These witnesses make various statements of fact in support of their testimony as to the reduction of speed, which would have been of considerable force if the alleged facts had been capable of verification, or had come from disinterested witnesses. The witnesses for the claimants also are interested. Commeau, the steerage passenger, on whose testimony claimants largely rely, made such an unfavorable appearance and told such an extraordinary story on the witness stand that his whole testimony must be discredited. Henderson, the master of the colliding ship, testifies that La Bourgogne was running between 15 and 20 knots an hour at the time of the collision. The testimony on both sides is necessarily unsatisfactory for various reasons. The chief officers of La Bourgogne were drowned. With the exception of Henderson, the persons on board the Cromartyshire were not examined. All the witnesses are interested. The passengers who testify to excessive speed were not experts. In these circumstances this question must be further considered in the side light of such evidence as that the fast steamships of this line, as of ocean lines generally, are apparently run at a dangerous speed in time of fog; that, unless La Bourgogne had been continuously running at approximately full speed, she could not have reached the point where she was at the time of the collision; that no orders to reduce speed are satisfactorily proved; and that when the horn of the Cromartyshire was heard the telegraph was put to "stand by," when, if La Bourgogne had already slowed down, the order would have been to "stop." The testimony of the witnesses for La Bourgogne that orders were given to close the ash-pit doors, and that this was done, shows that the

effect of such action would be at most to slightly diminish the speed of the engine, but not to sufficiently reduce speed; so that, after all allowances made, it would seem that the steamer must have been running at the rate of about 10 knots an hour. This conclusion is supported by the suddenness of the shock, the almost imperceptible interval between the hearing of the signal and the collision, and the severity of the concussion, shown by the disastrous consequences. It must be found that La Bourgogne was in fault for failure to reduce her speed to a point of safety, or to one at which such a collision might have been avoided.

4. In support of the contention that the collision did not occur without the privity or knowledge of the petitioner, it is alleged: First, that the petitioner had not made sufficient regulations to insure that the captains of its steamers should run them at moderate speed in fogs; second, that with knowledge that its captains ran ships at an excessive rate of speed, notwithstanding the existing regulations, it took no further measures for prevention; and, third, that, if it did not know such fact, it was negligent in failing to obtain such knowledge. An order of the company in reference to this matter, passed in 1884, is as follows:

"Our board of directors having seriously in mind the numerous collisions which daily occur at this season in the parts frequented by our steamers, we come to beg you to recall to all our captains individually the recommendations which we have always made to them, to use the greatest prudence in their navigation, and to never hesitate in certain doubtful cases to adopt the most suitable measures to assure the safety of their steamers, even if a loss of time should result from so doing. You will insist upon it with them that in times of fogs the most active watch be kept on board their vessels, and that all the prescriptions indicated in the rule as to collisions be strictly observed as well by day as by night."

And in 1891 the substance of this order was embodied in permanent regulations as follows:

"Art. 393. When the company's vessels are in localities frequented by vessels, especially in foggy weather and during the night, the engineer on watch and the necessary men for maneuvering must be within reach of the apparatus for changing the speed. The order is given by the officer of the watch to the engine room, and mention is made in the ship's log and that of the engineers of the hour at which that order was given and received.

"Art. 394. The company's vessels conform to the international rules for the purpose of preventing collisions. A printed copy of said rule is posted up in a conspicuous place, in order that the officers may take notice of it. The prescriptions of said rule relative to phonic signals to be caused to be heard in foggy weather must be rigorously observed; besides, in said circumstances, a man must be placed aloft on lookout.

"Art. 395. In conformity with the rules of international regulations, having for object the prevention of collisions, all vessels under steam which approach each other so that there may be risk of collision must diminish their speed, or stop and go backwards, if necessary. All vessels under steam must, during foggy weather, preserve a moderate speed. The captain, under these circumstances, must diminish the speed of his engines, and, in agreement with the Agent of Postes, the captain must make known by procès verbal the delays which such maneuvers may have occasioned."

Perhaps the court should take judicial notice of the almost universal practice of running ocean liners at excessive speed in fogs. There is considerable testimony in this case, however, to the effect

that the vessels of the French line did sensibly and materially reduce their speed on such occasions. Two of the captains testified that they always slowed down in a fog, and four passenger witnesses supported this testimony. On the other hand, six witnesses for the petitioner testified to the contrary. But even if it be assumed that the commanders of the steamships were in the habit of violating the foregoing rules, and that the company had knowledge thereof, there is not sufficient evidence to show that the company was negligent in its failure to enforce the rules. The evidence sustains the claim that the company had used due diligence in securing officers of experience and ability. It is not clear that any further precautions than those established by the orders and regulations quoted above would have been practicable. The question of rate of speed in a fog is one which cannot be determined by set rules, but must be left largely to the discretion of the officers of the ship. They are intrusted with the responsibility of the carriage of mails, freight, and passengers at the greatest speed which is consistent with safety. Their own lives, as well as those of the passengers and crew, are at stake. The determination of the question, therefore, as to what is to be done in all the varying stages between a light haze and a dense fog, rests upon a great variety of circumstances and conditions, all looking toward the question of what is a moderate rate of speed in existing conditions. In Transportation Co. v. Wright, 13 Wall. 104, 20 L. Ed. 585, the supreme court of the United States discusses at length the history of the limitation of the liability of shipowners from the earliest times, and quotes Valin as saying that, with certain exceptions, "it is just that the owner should not be bound for the acts of the master, except to the amount of the ship and freight; otherwise he would run the risk of being ruined by the bad faith or negligence of his captain. * * * It is quite sufficient that he be exposed to the loss of his ship and of the freight to make it his interest, independently of any goods he may have on board, to select a reliable captain." The court then adds:

"The great object of the law was to encourage shipbuilding, and to induce capitalists to invest money in this branch of industry. Unless they can be induced to do so, the shipping interests of the country must flag and decline. Those who are willing to manage and work ships are generally unable to build and fit them. They have plenty of hardiness and personal daring and enterprise, but they have little capital. On the other hand, those who have capital, and invest it in ships, incur a very large risk in exposing their property to the hazards of the sea, and to the management of seafaring men, without making them liable for additional losses and damage to an indefinite amount. How many enterprises in mining, manufacturing, and internal improvements would be utterly impracticable if capitalists were not encouraged to invest in them through corporate institutions by which they are exempt from personal liability, or from liability except to a limited extent. The public interests require the investment of capital in shipbuilding quite as much as in any of these enterprises. And if there exist good reasons for exempting innocent shipowners from liability, beyond the amount of their interest, for loss or damage to goods carried in their vessels, precisely the same reasons exist for exempting them to the same extent from personal liability in cases of collision. In one case, as in the other, their property is in the hands of agents whom they are obliged to employ."

In view of the foregoing conclusions, the question as to liability for loss of life becomes practically an academic one. For the purpose, however, of a formal disposition of this question in the decree, I hold, on the authority of Rundell v. La Compagnie Generale Transatlantique (D. C.) 94 Fed. 366, affirmed 40 C. C. A. 625, 100 Fed. 655, 49 L. R. A. 92, that there can be no recovery under the general maritime law for damages for negligence resulting in death on the high seas. Therefore the petitioner is not liable for claims for loss of life.

The testimony and exhibits in this case are very voluminous. Inasmuch as the only time permitted for its disposition has been during the crowded week in which my term of office as district judge expires, it has been impossible to give the full consideration to the complicated questions of fact and law which the importance of the interests involved demand, and would otherwise have received.

The petition is granted.