## THE MAIN *v.* WILLIAMS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MARYLAND.

No. 233.   Argued January 30, 31, 1894. — Decided March 5, 1894.

Under Rev. Stat. § 4283, the liability of a ship owner for the " freight then pending " extends, (1), to passage money, and, (2), to freight prepaid at the port of departure.

This was an appeal from a decree entered in a proceeding taken to limit the liability of the owners of the steamship Main for a collision with the steamship Montana, in respect to her "freight pending."

The proceedings were begun by a petition filed by the Nord Deutscher Lloyd, owner of the Main, setting forth the filing of a libel against the steamship for a collision with the steamship Montana, which occurred in the Patapsco River on January 5, 1889, wherein was claimed a sum largely in excess of the value of the Main and her freight then pending, and praying for the appointment of appraisers of the interest of petitioner in the ship and her freight for the voyage. The value of the vessel was subsequently fixed by stipulation at $70,000. The appraisers returned the amount of freight pending at $1577.38, which was disputed. The decree of the District Court subsequently fixed the gross amount of freight upon the cargo on board at the time of the collision, prepaid at Brèmen, as well as collectable at Baltimore, at $1870.10, and added thereto $5200 gross passage money prepaid at Bremen for the transportation of emigrant passengers for Baltimore, making in all $7070.10.

On appeal to the Circuit Court this decree was affirmed, and the owners of the Main appealed to this court.

*Mr. Thomas W. Hall* for appellant.

The word "freight" has, at most, in the English language, two acceptations. It is used as signifying: *first*, the burden or thing carried, whether by land or sea; *secondly*, the hire, price, or compensation paid for the carriage or transportation of goods or merchandise. Worcester's Dictionary; Webster's Dictionary; *Kirchner* v. *Venus*, 12 Moore, P. C. 390; Scrutton on Charter Parties, Art. 136; Nelson's Shipping, Art. 74; Maclachlan's Shipping, (4th ed.,) 474; *Brittan* v. *Barnaby*, 21 How. 527, 533.

Not only do the definitions given of the word "freight," whether by lexicographers or by the courts, negative and exclude any idea that the money, commonly called "fares,"

paid for the transportation of passengers, is included in or covered by the term "freight," but the courts, when asked, have expressly refused so to extend the meaning of the word. In an action by a broker to recover commissions upon his contract to obtain freight for a ship on a voyage from London to New South Wales, it was held that the passage money of steerage passengers procured by him could not be included in the estimate of the amount of freight, the words "cargo" and "freight" being terms applicable to goods only. *Lewis* v. *Marshall*, 7 Man. & Gr. 729.

So, in a suit brought to recover on a policy of insurance valued on freight, where the ship had been lost with a cargo of rice and coolies on board for Mauritius, it was held that the word "freight" in the policy did not include the passage money of the coolies. *Denoon* v. *Home & Colonial Ass. Co.*, L. R. 7 C. P. 341.

The Limited Liability Act was principally taken from the act 26 Geo. 3, and from the Revised Statutes of Maine.

While these statutes are *in pari materia*, it is evident that they are very far from being *in totidem verbis*. Not only is there a complete departure in the act of Congress from the language of the British statute, but the addition to the simple word "freight" found in the Maine and Massachusetts statutes, of the words "then pending," cannot be supposed to be without significance and intention. It is not necessary to quote lexicographers for the meaning of the word "pending." The words "then pending" not only limit the owner's liability on account of "freight" to the amount of freight pending at the time of the collision, but also to the amount of freight depending and contingent upon the termination of the voyage and the delivery of the goods. Otherwise, these words are utterly without meaning and mere surplusage. In its opinion in the case of *The City of Norwich*, 118 U. S. 468, 491, construing this very statute and section, this court has said: "Pending freight is of no value to the ship owner until it is earned, and it is not earned, if earned at all, until the conclusion of the voyage."

The rule of statutory construction, applicable to this case,

is well settled. Congress must be presumed to have understood the meaning of the words employed in the statute, and to have employed those words in their usual and ordinary sense. It is in this spirit that this court has already construed this section of the Revised Statutes, (§ 4283,) in *The City of Norwich,* 118 U. S. 468; *The Scotland,* 118 U. S. 507; and *The Great Western,* 118 U. S. 520. In these cases the court was pressed to extend the meaning of the word "interest" so as to include any insurance which the owner might have on the ship or freight, in the amount for which he should be held liable. But the court refused to enlarge by construction the meaning of the word "interest." In the opinion in the first of the cases referred to, that of *The City of Norwich,* at page 495, after fully stating the contention in the case, it is said, "The truth is that the whole question after all comes back to this: whether a limited liability of ship owners is consonant to public policy or not. Congress has declared that it is, and they, and not we, are the judges of that question. Having, as we think, ascertained the true construction of the statute, the point in dispute is really settled. It is a question of construction, and does not require an examination of the general maritime law to determine it. If the rule of the maritime law is different, the statute must prevail."

The appellant submits, with great respect, that the Circuit Court erred accordingly in including in the amount of its decree against the appellant on account of its liability for "freight then pending" at the time of the collision: (1) The sum of $847.23, freight on goods, prepaid at the port of Bremen "under an express stipulation and agreement that said freight money so prepaid was not to be returned, goods lost or not lost;" (2) the sum of $5200, also prepaid at Bremen for the passage money of immigrants who were on board of said ship at the time of the collision.

*Mr. J. Wilson Leakin* and *Mr. John H. Thomas,* (with whom was *Mr. George Leiper Thomas* on the brief,) for appellees.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case raises two questions: (1) as to whether, under Revised Statutes, § 4283, the liability of a ship owner for the "freight then pending" extends to passage money; and, (2), whether it extends to freight prepaid at the port of departure.

1. By the common law, as administered both in England and America, the personal liability of the owner of a vessel for damages by collision is the same as in other cases of negligence, and is limited only by the amount of the loss and by his ability to respond. *Wilson* v. *Dickson*, 2 B. & Ald. 2; *The Dundee*, 1 Hagg. 109, 120; *The Aline*, 1 W. Rob. 111; *The Mellona*, 3 W. Rob. 16, 20; *The Wild Ranger*, Lush. 553, 564; *Cope* v. *Doherty*, 4 K. & J. 367, 378. The civil law, too, as well as the general law maritime, made no distinction in this particular in favor of ship owners. (Emerigon, Contrats à la grosse, c. 4, § 11.) Nor did the ancient laws of Oleron or Wisby or the Hanse towns suggest any restriction upon such liability. Indeed, it is difficult, if not impossible, to say when and where the restrictions of the modern law originated. They are found in the Consolato del Mare, which, in two separate chapters, expressly limits the liability of the part owner to the value of his share in the ship. Vinnius, an early Continental writer, states that by the law of the land the owners were not chargeable beyond the value of the ship and the things that were in it. The Hanseatic Ordinance of 1644 also pronounced the goods of the owner discharged from claims for damages by the sale of the ship to pay them. But however the practice originated, it appears, by the end of the seventeenth century, to have become firmly established among the leading maritime nations of Europe, since the French Ordinance of 1681, which has served as a model for most of the modern maritime codes, declares that the owners of the ship shall be answerable for the acts of the master, but shall be discharged therefrom upon relinquishing the ship and freight. (Bk. II, Tit. VIII, Art. 2.) A similar provision in

the Ordinance of Rotterdam of 1721 declared that the owners should not be answerable for any act of the master done without their order, any further than their part of the ship amounted to ; and by other articles of the same ordinance it was provided that each part owner should be liable for the value of his own share. The French Ordinance of 1681 was carried, with slight change of phraseology, into the commercial code of France, and all the other maritime nations whose jurisprudence is founded upon the civil law. (Code de Commerce (French) Art. 216 ; German Mar. Code, Art. 452 ; Code of the Netherlands, Art. 321 ; Belgian Code, Art. 216 ; Italian Code, Art. 311 ; Russian Code, Art. 649 ; Spanish Code, Art. 621, 622 ; Portuguese Code, Art. 1345 ; Brazilian Code, Art. 494 ; Argentine Code, Art. 1039 ; Chilian Code, Art. 879.)

The earliest legislation in England upon the subject is found in the act of 7 Geo. 2, c. 15, passed in 1734, which enacted that no ship owner should be responsible for loss or damage to goods on board the ship by embezzlement of the master or mariners, or for any damage occasioned by them without the privity or knowledge of such owner, further than the value of the ship and her appurtenances, and the freight due or to grow due for the voyage, and if greater damage occurred it should be averaged among those who sustained it. By subsequent acts this limitation of liability was extended to losses in which the master and mariners had no part, to losses by their negligence, and to damage done by collision, while there was an entire exemption of liability for loss or damage by fire or for loss of gold and jewelry, unless its nature and value were disclosed. In all these statutes the liability of the owner was limited to his interest in the ship and freight for the voyage.

By section 505 of the Merchants' Shipping Act of 1854, 16 and 17 Vict. c. 131, freight was deemed to include the value of the carriage of goods, and *passage money*. Owing, probably, to some difficulties encountered in determining at what point of time the value of the ship should be taken, and to establish a more uniform and equitable method of limiting the liability of the owner, the Merchant Shipping Act Amendment Act of 1862, extended the provisions of the prior acts to foreign

as well as British ships, and to cases of loss of life or personal injury, as well as damage or loss to the cargo, and provided that the owners should not be liable in damages in respect of loss of life or personal injury, "to an aggregate amount exceeding fifteen pounds for each ton of their ship's tonnage," nor in respect of loss or damage to ships or their cargoes to an amount exceeding eight pounds per ton.

The earliest American legislation upon this subject is found in a statute of Massachusetts passed in 1818, and revised in 1836. This was taken substantially from the statute of George II. It was followed by an act of the legislature of Maine in 1831, copied from the statute of Massachusetts.

The attention of Congress does not seem to have been called to the necessity for similar legislation until 1848, when the case of *The Lexington*, reported under the name of the *New Jersey Steam Navigation Co.* v. *Merchants' Bank*, 6 How. 344, was decided by this court. In this case the owners of a steamboat, which was burnt on Long Island Sound, were held liable for about $18,000 in coin, which had been shipped upon the steamer and lost. In consequence of the uneasiness produced among ship owners by this decision, and for the purpose of putting American shipping upon an equality with that of other maritime nations, Congress, in 1851, enacted what is commonly known as the Limited Liability Act, which has been incorporated into the Revised Statutes, sections 4282 to 4290, and amended in certain particulars not material to this case, in two subsequent acts. Act of June 26, 1884, c. 121, § 18, 23 Stat. 53, 57; Act of June 19, 1886, c. 421, § 4; 24 Stat. 79, 80.

By section 4283, upon the construction of which this case depends, "the liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing lost, damage, or forfeiture done, occasioned, or incurred, without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

By the law maritime the word "freight" is used to denote not the thing carried, but the compensation for the carriage of it. Prior to the era of steam navigation, travel by sea was comparatively of such little magnitude that "freight" was commonly used to denote compensation for the carriage of goods; yet, in Les Bones Costumes de la Mar, (Black Book, 3 Twiss' ed. 50, App. Pt. III,) it is said "the term passenger includes all those who ought to pay freight for their persons apart · from their merchandise," and "every man is called a passenger who pays freight for his own person, and for goods which are not merchandise. And every person who carries less than two quintals ought to pay freight for his own person;" and in this, one of the most ancient books upon the maritime law, (at least as old as the fourteenth century,) it is also said: "And in this same manner with regard to any person who may come on board the ship without the consent of the managing owner or of the ship's clerk, it is in the power of the managing owner to take what freight he pleases." (Ibid. pp. 173–5.) That passengers' fares were regarded as the substantial equivalent of freight is evident from the case of *Mulloy* v. *Backer*, 5 East, 316, 321, in which Lawrence, Judge, remarks that "foreign writers consider passage money the same as freight;" and Lord Ellenborough adds, "except for the purposes of lien, it seems the same thing." In this country, as early as 1801, it was said by Judge Peters in the case of the *Brig Cynthia*, 1 Pet. Adm. 203, 206: "I think the force and true meaning of 'freight' has been misconceived. It is a technical expression. It does not always imply that it is the *naulum, merces*, or *fare*, for the transportation of goods. It is applied to all rewards, hire, or compensation, paid for the use of ships; either for an entire voyage, one divided into sections, or engaged by the month, or any period. It is also called *freight* (and it is to be determined on the like legal principles) in the case of passengers, transported in vessels, for compensation. In *Saxon*, from which much of the English language is derived, it is called *fracht*, whether it be a compensation for transportation in ships by sea, or carriage by land, either of goods or persons, in gross, or detail."

With the introduction of steam vessels, however, the carriage of passengers became at once a most important branch of maritime industry, and modern authorities have generally placed the fare or compensation for the carriage of such passengers upon the same footing as freight for the transportation of goods. While many of the lexicographers, such as Webster, Worcester, and the Imperial Dictionary, still define freight as the sum paid by a party hiring a ship or part of a ship, or for the carriage of goods, in the Century Dictionary it is said to be, in a more general sense, the price paid for the use of a ship, including the transportation of passengers. Similar definitions are given in the law dictionaries of Burrill, Bouvier, and Anderson. See also Benedict's Admiralty, sections 283, 286, and 288.

Our attention has not been called to any express adjudications upon the question involved here, but, so far as the courts have been called upon to consider the subject, they have usually given to the word freight the same definition. Thus in *Flint* v. *Flemyng*, 1 B. & Ad. 45, which was an action upon an insurance policy upon freight, it was held that plaintiff could recover freight upon his own goods, Lord Tenterden holding that the word "freight," as used in policies of insurance, imported the benefit derived from the employment of a ship. So, in *Brown* v. *Harris*, 2 Gray, 359, the Supreme Court of Massachusetts, holding that passage money, paid in advance, might be recovered back, upon the breaking up of the voyage, observed that the rule was well settled as to freight for the carriage of goods; that if freight be paid in advance, and the goods not carried for any event, not imputable to the shipper, it is to be repaid, unless there be a special agreement to the contrary. The court further observed: "Passage money and freight are governed by the same rules. Indeed, freight, in its more extensive sense, is applied to all compensation for the use of ships, including transportation of passengers." See also 3 Kent Com. 219.

It is true that in the case of *Lewis* v. *Marshall*, 7 Man. & Gr. 729, it was said that freight was a term applicable to goods only, but this was said with reference to a contract

which made a distinction between freight upon a cargo and the fare of steerage passengers. The same remark may be made of the case of *Denoon* v. *Home and Colonial Insurance Co.*, L. R. 7 C. P. 341, in which it was held that the question whether the term " freight " in a marine policy includes passage money, must depend upon the circumstances of each particular case, and the context of the particular policy ; and, in that case, under the particular terms of the policy, which made a different rate of insurance upon freight and the transportation of coolies, it was held that the insurance did not cover the price to be paid for their transportation.

The real object of the act in question was to limit the liability of vessel owners to their interest in the *adventure;* hence, in assessing the value of the ship, the custom has been to include all that belongs to the ship, and may be presumed to be the property of the owner, not merely the hull, together with the boats, tackle, apparel, and furniture, but all the appurtenances, comprising whatever is on board for the object of the voyage, belonging to the owners, whether such object be warfare, the conveyance of passengers, goods, or the fisheries. *The Dundee*, 1 Hagg. 109 ; *Gale* v. *Laurie*, 5 B. & C. 156, 164. It does not, however, include the cargo, which, presumptively at least, does not belong to the owner of the ship.

There is no reason, however, for giving to the word " freight " a narrow or technical definition. The fares of the passengers are as much within the reason of the rule as the freight upon the cargo. It would be creating a distinction without a real difference to say that a transatlantic steamer laden with passengers should be wholly exempt from the payment of freight, while another, solely engaged in the carriage of merchandise, should be obliged to pay the entire proceeds of her voyage. The words " freight pending," in section 4283, or " freight for the voyage," section 4284, were copied from the English statute of George II, which, in turn, had taken them from the Marine Ordinance of 1681, and the prior Continental codes; but in both cases they were evidently intended to represent the *earnings* of the voyage, whether from the carriage of passengers or merchandise. If these words were used

instead of the words "freight for the voyage," it would probably more accurately express the intent of the legislature.

2. Nor by the use of the word "pending" was it intended to limit the recovery to the uncollected freight, or such as had not been completely earned at the time of the disaster. As the object of the statute was to curtail the amount that would otherwise be recoverable, it should not be construed to abridge the rights of the owner of the injured vessel to a greater extent than its language will fairly warrant. This is the view taken in *Wilson* v. *Dickson*, 2 B. & Ald. 2, 10, in which the court held the words "freight due or to grow due" included all the freight for the voyage, whether paid in advance or not.

It is worthy of remark in this connection that the codes of the Netherlands, of Chili, and of the Argentine Republic, in the sections above quoted, extend the liability for freight to such as is earned and yet to be earned.

The English courts have held, very properly we think, that these statutes should be strictly construed. As observed by Abbott, C. J., in *Gale* v. *Laurie*, 5 B. & C. 156, 164 : "Their effect, however, is to take away or abridge the right of recovering damages, enjoyed by the subjects of this country at the common law, and there is nothing to require a construction more favorable to the ship owner than the plain meaning of the word imports." To the same effect are the remarks of Sir Robert Phillimore in *The Andalusian*, 3 P. D. 182, 190, and in *The Northumbria*, L. R. 3 Ad. & El. 6, 13. Speaking of this statute, Lord Justice Brett, in *Chapman* v. *Royal Netherlands Nav. Co.*, 4 P. D. 157, 184, remarked : "A statute for the purposes of public policy, derogating to the extent of injustice, from the legal rights of individual parties, should be so construed as to do the least possible injustice. This statute, whenever applied, must derogate from the direct right of the ship owner against the other ship owner. . . . It should be so construed as to derogate as little as is possible consistently with its phraseology, from the otherwise legal rights of the parties."

While, from the universal habit of insuring vessels, the application of the statute probably results but rarely in an

actual injustice to the owner of the injured vessel, yet, being in derogation of the common law, we think the court should not limit the right of the injured party to a recovery beyond what is necessary to effectuate the purposes of Congress.

We are satisfied with the conclusions of the court below upon both of the points involved, and its decree is, therefore,

*Affirmed.*