MATHEWS, Circuit Judge, dissenting.

Joseph C. Sharp, Hone & Hone, Derby, Sharp, Quinby & Tweedt, and S. Hasket Derby, all of San Francisco, Cal. (Charles L. Hemmings and Donald Lobree, both of San Francisco, Cal., of counsel), for appellant.

Redman, Alexander & Bacon, James M. Wallace, and Herbert Chamberlin, all of San Francisco, Cal., for appellee.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is a proceeding brought by Union Dredging Company, a California corporation, the owner of the dredger Carson, under the limitation of liability act, 46 U.

## THE CARSON.
## BRASHEAR v. UNION DREDGING CO.
### No. 8982.

Circuit Court of Appeals, Ninth Circuit.
June 15, 1939.

S.C.A. § 183. The corporation petitions for exoneration from liability for the drowning on May 17, 1934, of one of its firemen, Earl Brashear, who had become violently insane several hours before he jumped overboard and was insane at the time of the drowning. In the alternative, the petition seeks limitation of liability to the value of the dredge and her freight pending for the dredging voyage on San Francisco Bay, on which she was engaged at the time of the drowning of the insane man. A reference for the valuation of the res in limitation was had, the value determined and a stipulation filed for its amount. On publication and service of the monition, the only claims filed were by the deceased's wife and children.

■ The appeal is a trial de novo. The facts on which we base our decision are undisputed. The dredger Carson in the month of May, 1934, was afloat on San Francisco Bay, opposite Hamilton Field, engaged in deepening a channel to provide readier access to Hamilton Field. About 7 p. m. of the evening of May 16, 1934, Brashear, who had been firing on the dredge, complained of being sick. He sent for Fancort, a fellow member of the crew, who found him in bed, in distress. Fancort gave him some aspirin and left him lying in bed.

About midnight, Vogel, another member of the crew, and Fancort saw Brashear on the launch tied at the stern of the dredge. He was leaning over, talking to some imaginary person. Fancort called Brashear, but Brashear made no rational response. He would not come off the launch and did not answer Fancort. So Vogel held the launch while Fancort compelled Brashear to come on the dredge with him. Instead of putting Brashear to bed and attending to him in his cabin, Fancort took Brashear into the fire room of the dredge where there was only a bench for him to rest on. He evidently was afraid that Brashear was going to jump overboard and asked Vogel to stay with him to guard Brashear. From midnight until almost 5 o'clock, Brashear went through a series of alternate periods of frenzy and quiet. In the periods of frenzy he would foam at the mouth, rave, climb under machinery, run around and act like a man possessed. He talked "about somebody putting fish hooks into his baby's eyes" and wedged himself under a bench so that he was stuck and could not get out. Vogel stayed about 15 minutes and when Vogel left to go to bed about 1 a. m. Fancort had another fireman named Pedersen

get out of bed to come down. He corroborates the testimony as to the alternate periods of frenzy and quiet. He was "out of his head there off and on"—"just running around". On coming down he found Fancort sitting on top of Brashear in order to restrain him. Brashear was foaming at the mouth and out of his head. At 3 o'clock, Fancort evidently became desperate and went up to ask Captain Forsyth what to do. He told Forsyth that Brashear was in "bad shape", that he was "pretty bad", but "maybe he could take care of him". (Emphasis supplied).

The captain discussed tying the man up and discussed the question of sending Brashear ashore in the launch to a hospital. There was a launch then available for this purpose. However, it developed that he thought they needed the launch to go after water for the boilers on the dredge, and the captain told Fancort to wait until after the launch was used to get the water. Thereafter they intended to take Brashear to a hospital.

Captain Forsyth, who was in charge of the dredge, testified that he did not want to send the launch to Hamilton Field at that time because it was low tide, but, in view of his testimony that there was no hospital at Hamilton Field, it is obvious that the real explanation is that he was more interested in getting water for his dredge than seeing that Brashear was given the medical attention necessary for a man in his condition. First aid would have been useless. Forsyth admitted that what prevented him from using the launch to send Brashear ashore was that he preferred to use the launch to get water.

Fancort returned to the engine room, where he and Pedersen continued to watch Brashear. There were further alternate periods of frenzied ravings and periods of quiet. Things got so bad that about 4.30 a. m. Fancort again went to see Forsyth as to what could be done. They again discussed the propriety of tying up Brashear or sending him to the hospital. It was again decided not to send Brashear ashore until after water was obtained for the dredge and, obviously, if the launch was to be sent for water, they could not take care of Brashear, as there were no facilities at McNear's Point to take care of such a case, and it was to McNear's Point they had to go for water.

Fancort finally left Forsyth, with the assurance that he thought Pedersen and he

could hold Brashear until the Captain was ready to send him ashore.

When Fancort returned to the engine room, Brashear was having one of his quiet intervals. Fancort then went up to get a cup of coffee. While he was on his way for the coffee, Brashear was left alone with Pedersen. The latter was apparently getting sleepy, as it was then 4.30 or 5 a. m., and Pedersen had been called out of bed at 1 a. m. Brashear rose hurriedly and dashed through the door and into the water before Pedersen could stop him. Brashear was out of his head and obviously trying to drown himself. He refused to reach for a plank that was thrown into the water after him. Pedersen was an expert life saver, with a life boatman's certificate from the United States Government and both he and Fancort testified they would have gone out to save Brashear had any boat been available. The only boat available had been broken two days before so that nothing could be done except to stand and watch the man drown.

Just before Brashear went overboard, the launch had gone on its way to McNear's Point for water. Fancort blew the whistle for the launch to come back but by the time the launch got back, it was too late to do anything except grapple for the body.

With respect to the broken boat: the trial court found it was broken on Tuesday, May 15, 1934. On the Wednesday before the drowning, which happened Thursday, the captain had sent the launch ashore to get some lumber with which to repair the boat, but the repairs had not been made, though they were in the course of being made. He should have got another boat at the same time he got the lumber, but did not think to get this other boat until Brashear was drowned.

Here we find a violation of the obligation of the captain of the dredge to his insane fireman. The captain knew Brashear was in the heat of the fire room with its bench as the sick man's only resting place, and, though he knew Brashear must be "held" in physical restraint by some fellow member of the crew, yet he neither sent Brashear to be confined in his cabin where he could have rested in bed while attended by his shipmates—nor much less did the captain put him to bed in his own cabin where Brashear better could have been cared for. The captain did not even leave his bed to see for himself his employee's condition. It was the master's duty to see to it either that the insane man was safely confined on the dredge or that he was taken at once in a launch to a hospital in the city of San Rafael, only a few miles distant. Had the obligation to Brashear been performed the drowning would not have occurred.

The captain was also negligent in not keeping the barge in a seaworthy condition with reference to the requirement that a life boat be available for the rescue of any member of his crew who might fall overboard. His life boat had been smashed on the 15th. On the 16th, he sent his launch for lumber to repair it, but failed to bring back another boat which he could have obtained at any one of several nearby ports on the bay. The absence of the life boat prevented any effective attempt to rescue Brashear from his insane attempt to destroy himself.

■ Since the obligation of the captain was to exercise reasonable care to protect his fireman from the latter's own insane acts likely to cause him to fall or jump into the waters surrounding the dredge, and to keep available a life boat for rescue purposes, that he insanely so did jump and drown did not constitute a superseding cause making a break in the causation chain from the breach of the obligation to Brashear. His irrational action was what was reasonably to be expected from that breach. We hold that the captain's violation of his obligation to Brashear was the proximate cause of his death and that the company is liable for an amount to be determined by the district court.

With regard to the company's privity and knowledge, it appears that the barge captain's duties, in essence, were no different from those of the captain of a merchant ship on a voyage at sea. He had full charge of the barge and its operations, obtained materials for her minor repairs and engaged her crew and directed their employment, just as any merchant captain. The alter ego of the company was its principal stockholder and general manager, Edward F. Haas. It is clearly shown that he was not privy to and had no knowledge of Brashear's death or its cause and did not learn of the drowning until he visited the barge some time afterwards. The company is entitled to limit its liability to the value of the vessel and her pending freight.

■ The petition admits the death of Brashear was while the dredge was "in the course of a voyage which commenced on

or about the 9th day of May, 1934, and which ended on or about the 28th day of May, 1934,". The appraisement of the res, that is the ship and her freight pending for the voyage, was referred to a commissioner. The commissioner found and reported the value of the Carson at $9,500, which value was confirmed by the district court. The commissioner made no report on the amount of pending freight, that is, the gross earnings of the dredge without deductions of any kind in the 20 days of her voyage. The Captain Jack, D.C.Conn., 162 F. 808; In re W. E. Hedger Co., 2 Cir., 59 F. 2d 982, 983; The Steel Inventor, D.C.N.Y., 36 F.2d 399, 400; The Main v. Williams, 152 U.S. 122, 14 S.Ct. 486, 38 L.Ed. 381. The amount of gross earnings is to be determined and added to the fund for limitation.

Reversed, for further proceedings as above indicated.

MATHEWS, Circuit Judge (dissenting).

Brashear's death was not caused by any unseaworthiness of appellee's dredge nor by any negligence of its master or crew. The proximate and sole cause of Brashear's death was his own act in jumping overboard and drowning himself. The trial court so found and could not, consistently with the evidence, have found otherwise.

The decree should be affirmed.