In the Matter of **INDEPENDENT TOW-ING COMPANY, Inc., as Owner of the TUG ITCO, III, praying for exoneration from or limitation of liability.**

**Admiralty No. 6267.**

United States District Court
E. D. Louisiana,
New Orleans Division.

April 15, 1965.

On Rehearing June 18, 1965.

Charles Kohlmeyer, Jr., George A. Frilot, III, George B. Matthews, and Lemle & Kelleher, New Orleans, La., for petitioners Independent Towing Co. and for Scottish Union and National Insurance Co. and Stuyvesant Ins. Co., as underwriters for petitioner.

Donn Moss, Herbert, Glusman & Moss, Baton Rouge, La., S. E. Lee, Jr., Berry and Lee, Winnsboro, La., for Mrs. Mary Cockerham, as administratrix for Estate of Arnold Cockerham.

Robert B. Acomb, Jr., and Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for claimant-respondent, Gulf Oil Corporation.

George V. Baus and Adams & Reese, New Orleans, La., for Fowler Pipeline Contractors, Inc., and Aetna Casualty and Surety Co.

Samuel Gainsburgh, Kierr & Gainsburgh, New Orleans, La., amici curiæ.

**FRANK B. ELLIS, District Judge.**

The vessel owner in this case has filed a limitation proceeding in connection with a maritime casualty which occurred in Louisiana. The customary monition has been issued along with an injunction prohibiting all other suits against the vessel and the owner. The claimants, pursuant to the provisions of Louisiana's Direct Action Statute (LSA–R.S. 22:655) have instituted civil actions against the vessel's underwriters. The underwriters, as defendants in the civil action, have moved this court to stay such actions pending the outcome of the limitation proceeding.

This unique situation requires consideration of several questions, such as the effect of a limitation fund on the extent of an insurer's liability. More specifically, is a vessel's protection and indemnity insurer entitled to the benefits of the shipowner's limitation of liability? Also to be considered is the procedural compatibility of a direct action with a limitation of liability proceeding. Certainly these questions were in the foreground when the Cushing case [1] was before the Supreme Court, but because of the unusual 4–4–1 decision in that case, some of the basic substantive and procedural issues remained unresolved.[2] Further avoidance at this time of a determinative resolution cannot be justified, for such ambiguity in the law necessarily negates its inherent value to litigants, counsel and courts.

In order to determine the place and effect, if any, which Louisiana's Direct Action Statute has in the circumstances of a maritime casualty which results in a vessel owner's exercise of his federally-created right to institute a limitation proceeding, it is first necessary to qualify the precise nature of the defense of limitation of liability. Although the history of limitation was considered to be a "matter of common knowledge" by American jurists of the last century,[3] the issues presently at bar compel a re-examination of the development of that concept.

The system by which vessel owners are enabled to limit their liability is of statutory origin in the United States.[4] However, in 1831, long before there was any federal legislation on the subject, the history of limitation as a principle of maritime law was so thoroughly analyzed by Judge Ware in the case of THE REBECCA.[5] that four decades later the Supreme Court commented that "[t]he learned opinion of Judge Ware in the case of THE REBECCA leaves little to be desired on the subject."[6] Since the elapse of some one hundred and thirty-four years does not appear to have detracted from the validity of that learned analysis, the court, in an appendix to this opinion, has taken the liberty to quote extensively from THE REBECCA in the belief that it will contribute to a better understanding of the important substantive issue before us. Meanwhile, the following excerpts from that analysis should reveal the particular interests continually sought to be protected by the concept of limitation of liability:

"* * * in adopting this principle of the responsibility of the owners for the acts of the master * * * most of the nations of Europe

---

1. Maryland Casualty Co. v. Cushing, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954).

2. See, Gilmore & Black, Admiralty, § 10–31, p. 715 (1957 ed.).

3. See, statement by Justice Bradley to this effect in Norwich & N. Y. Transp. Co. v. Wright, 13 Wall. 104, 116, 80 U.S. 104, 116, 20 L.Ed. 585 (1871).

4. Norwich & N. Y. Transp. Co. v. Wright, supra, at 119; 3 Benedict on Admiralty § 474, p. 310, Knauth's 6th ed. (1940).

5. 20 Federal Cases 373, Case #11,619 (D.Ct.Maine 1831).

6. Norwich & N. Y. Transp. Co. v. Wright, 13 Wall. 104, 116, 80 U.S. 104, 116, 20 L.Ed. 585 (1871).

\* \* \* adopted it with an important qualification. They held the *owners* severally bound in solido for the acts of the master, whether tort or contract, but limited the extent of *their* liability to the value of the ship. The creditors had always their remedy against the vessel, and through that, each owner was liable, but not beyond *his share* in the vessel. (20 Fed.Cases p. 376)

\* \* \* \* \* \*

"But *the owners* shall not be liable except for the amount of their shares in the ship." (p. 376)

"In the jurisprudence of the Consulate, in addition to the direct liability of the master himself, the vessel was tacitly hypothecated for the obligations contracted by him both ex contractu and ex delicto, but there resulted from them no *personal* liability on the owners." (p. 376)

\* \* \* \* \* \*

"The law of Holland has always limited the responsibility of the *owners* in the same manner, and discharges *them* from all *personal* liability, upon their abandoning their interest in the ship." (p. 376)

\* \* \* \* \* \*

"The law of Sweden is explicit, that if the *owners* choose to abandon the ship, the creditor can demand nothing more, nor touch their other property unless they have specially bound themselves." (p. 377)

\* \* \* \* \* \*

"\* \* \* I think it may safely be affirmed that, by the general maritime law of Europe, the liability of *owners* for the wrongful acts of the master is limited to the interest they have in the ship, and that by abandoning the ship and freight to the creditor they discharge themselves from all *personal* responsibility." (p. 377)

\* \* \* \* \* \*

"\* \* \* by the general maritime law, the responsibility of the *owners* for the acts of the master, is limited to the value of the vessel and freight \* \* \*." (p. 377).

\* \* \* \* \* \*

"\* \* \* [T]he person who advanced the capital \* \* \* should not be *personally* liable \* \* \*." (p. 378)

\* \* \* \* \* \*

"But *the owners* were under no *personal* liability for the obligations of the master, arising either ex contractu or ex delicto. His contracts and torts bound their shares of the vessel, but bound *them* no further." (p. 379)

\* \* \* \* \* \*

" 'The obligations of the proprietors' \* \* \* 'are rather real than personal.' " (p. 379) (Emphasis added.)

These excerpts from Judge Ware's opinion, and particularly the more extensive quotation therefrom in the appendix, reveal the apparent influence in this case of economic interests upon legal theory, for throughout, the advantage of limiting capital risk and liability appears as an inducement directed particularly towards individual financial involvement in maritime activity which could largely contribute to the economic interests of the state in its development and expansion of maritime commerce. Thus evolved a legal concept which would afford personal financial protection to the possessor of capital in his individual capacity and status as a shipowner. Although his obligations in this capacity would be understood as being "rather real than personal", in addition to the real rights and liabilities (those related directly to and emanating directly from the res itself [i. e. the vessel]) an additional defense was created which existed beyond the scope and essence of the res and which inured to the benefit of the shipowner strictly by virtue of his individual status as a capital investor in maritime commercial activity. In this capacity the shipowner became invested with a certain defense personal to him and to him alone. In addition to the language in THE REBECCA which sug-

gests this conclusion, the court recognizes the authoritative effect of certain conclusions of law as stated in treatises of renowned jurisconsults whose works have contributed substantially to modern civil law. In one of his most extensive undertakings, which included a particular study of maritime law, Dalloz observed, with reference to a shipowner's abandonment of the vessel to his creditors:

"§ 6. BY WHOM AND IN WHAT FORM MAY ABANDONMENT BE MADE [7]

"2417.—I. *From whom may abandonment emanate*

" * * * the right of abandonment; it is a *faculty personal to the insured.*" [8] (Emphasis added.)

Boulay-Paty, in his commentaries on maritime insurance, as previously analyzed by Emerigon, cites the following statement from Pothier:

" 'There is one thing *particular to the owner* of a vessel,' says Pothier: ' * * * the shipowners are only liable for the obligations incurred by the master to the extent of their interest in the vessel. * * * ' [9]

(Emphasis added.)

Thus, even before venturing into a study of our own limitation statute, an examination of the history of limitation in the light of the civil law, under which maritime law was initially developed, indicates conclusively to this court that limitation of liability historically developed as a *personal defense* particular to the shipowner. Apparently, the American experience with limitation has not deviated from this development.

■■ On March 31, 1851, Congress enacted our first federal law providing for limitation of a shipowner's liability.[10] The intended purpose was the already stated historical one, namely, to enhance the development of the nation's merchant marine [11] and there is now little doubt that United States shipowners were intended to be the immediate and specific beneficiaries of this Congressional legislation. 46 U.S.C. § 183(a) (b) (d); The Aquitania, 20 F.2d 457, 458, (2 Cir. 1927); Maryland Casualty Co. v. Cushing, 347 U.S. 409, 413–414, 433, 74 S.Ct. 608, 98 L.Ed. 806 (1954). In re Reading's Petition, 169 F.Supp. 165, 167 (N.D. N.Y.1958). The liabilities intended to be limited by this statute were those liabilities *peculiar to the individual as a shipowner*. Great Lakes Towing Co. v. Mill Transportation Co., 155 F. 11, 16, 22 L.R.A.,N.S., 769 (6 Cir. 1907). A petition for exoneration from or limitation of liability has always been construed as a defensive action and the proceeding apparently one *in personam*. 3 Benedict on Admiralty, § 479, p. 342 (1940 ed.); In re Putnam, 55 F.2d 73 (2 Cir. 1932) Learned Hand, J. That it is *in personam* is further supported by Chief Judge Lumbard's opinion in Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 96 A.L.R.2d 1085 (2 Cir. 1961), cert. den. 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526; cert. den. 370 U.S. 937, 82 S.Ct. 1577, 8 L.Ed.2d 806; reh. den. 370 U.S. 965, 82 S.Ct. 1580, 8 L.Ed.2d 835; and authorities cited therein. In that decision, the

---

7. As previously indicated, the shipowner was enabled to limit his liability by abandoning to the creditors his interest in the vessel.

8. Dalloz, Supplément au Répertoire de Législation, de Doctrine, et de Jurisprudence, vol. 6, Droit Maritime, Chap. 8, Sect. 8, Art. 1, § 6 (1890).

9. Boulay-Paty, Traité des Assurances d'Emerigon, Vol. 2, p. 490 (Conférence) XXVII (1727).

10. Rev.Stat. 4281–89 (1875); as amended, 1958, 46 U.S.C. §§ 181–189. Prior to 1851, Massachusetts in 1818 (revised 1836) and Maine in 1831 had enacted limitation statutes based upon the Statute of George II. See, The Main v. Williams, 152 U.S. 122, 14 S.Ct. 486, 38 L.Ed. 381 (1894).

11. Moore v. American Transp. Co., 24 How. 1, 39, 65 U.S. 1, 39, 16 L.Ed. 674 (1860); The Main v. Williams, supra, 152 U.S. at 128, 14 S.Ct. 486; Liverpool, etc., Nav. Co. v. Brooklyn Eastern Dist. Terminal, 251 U.S. 48, 53, 40 S.Ct. 66, 64 L.Ed. 130; American Car & Foundry Co. v. Brassert, 289 U.S. 261, 263, 53 S. Ct. 618, 77 L.Ed. 1162 (1933).

limitation proceeding was described as "the administration of equity in an admiralty court." It was also stated that "all the ease with which rights can be adjusted in equity is intended to be given to the proceeding." 295 F.2d at p. 597. See also, Hartford Accident & Indemnity Co. of Hartford v. Southern Pacific Co., 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612 (1927). Since equity traditionally has been concerned with those mitigating circumstances more or less *personal* in nature which involve one individual's relations vis-a-vis another, it then follows that limitation, as "the administration of equity in admiralty" is a proceeding *in personam* which evokes defenses *personal* in nature. Therefore, as a defensive action, *in personam*, a petition for exoneration from or limitation of liability is the assertion of a *personal defense.*

■ This conclusion leads directly to the solution of one of the basic issues first stated; namely, the effect, if any, of a limitation fund on the extent of an underwriter's liability in a direct action proceeding. Stated otherwise, suppose the owner of a vessel is found liable for certain injuries and damages, but is entitled under the limitation statute to limit his liability to the value of the vessel or the fund which is insufficient to satisfy all claims. Should the owner's liability insurer be permitted to hide behind the protective barrier of the limitation fund? This court thinks not.

The Louisiana Direct Action Statute (LSA–R.S. 22:655) has consistently been interpreted to deprive insurers or underwriters of the insured's *personal defenses.* LSA–Civil Code, Art. 2098; Rouley v. State Farm Mutual Automobile Ins. Co., 235 F.Supp. 786, 793 (W.D.La. 1964); Musmeci v. American Automobile Insurance Co., La.App., 146 So.2d 496 (4 Cir. 1962), cert. den. Jan. 14, 1963; Dumas v. United States Fidelity & Guaranty Co., 241 La. 1096, 134 So.2d 45, 50 (1961); Scarborough v. St. Paul Mercury Indemnity Co., La.App., 11 So.2d 52 (1 Cir. 1942); Harvey v. New Amsterdam Casualty Co., La.App., 6 So.2d 774 (Orleans 1942); Lusk v. United States Fidelity & Guaranty Co., La.App., 199 So. 666 (Orleans 1941); Brooks v. Bass, La.App., 184 So. 222 (Orleans 1938); Messina v. Société Francaise de Bienfaissance Et D'Assistance Mutuelle De La Nouvelle Orleans, La.App., 170 So. 801 (Orleans 1936); Rome v. London & Lancashire Indemnity Co. of America, La.App., 169 So. 132 (Orleans 1936); Edwards v. Royal Indemnity Co., 182 La. 171, 161 So. 191 (1935); see also, Comment, 10 Tulane Law Review 312 (1936); Comment, 103 Pa.La.Review 263 (1954).

Therefore, as a defense personal to the shipowner, limitation of liability and the apparent benefits thereof cannot be urged or asserted by the shipowner's liability insurer, or for that matter by anyone else.

■ As previously stated, there is little doubt that the benefits of the congressional legislation of 1851 which provided for limitation of liability were intended to inure to the benefit of a specific commercial class, namely United States shipowners. First of all, the literal content of the limitation act contains no reference even by inference to any party other than an owner or owner *pro hac vice* of a vessel. Nowhere is there the slightest hint that the benefits of the Act, a statute certainly in derogation of common law rights and remedies, were to be available to a paid insurer of the vessel's liability; nowhere is there any indication that any other class aside from shipowners were forseeably intended to become direct beneficiaries of this legislation.

In Lake Tankers Corp. v. Henn, 354 U.S. 147, 77 S.Ct. 1269, 1 L.Ed.2d 1246 (1957), the Supreme Court declared:

"The shipowner's right to limit liability is not so boundless. The Act is not one of immunity from liability but of limitation of it and we read no other privilege for the shipowner into its language over and above that granting him limited liability." 354 U.S. at pp. 152–153, 77 S.Ct. at p. 1272. (Emphasis added.)

If the provisions of the Act are not to be extended so as to further benefit the shipowner, for whose benefit the Act was originally passed, then certainly they cannot be extended to benefit anyone else. See also, In re Victory Towing Co., 219 F.Supp. 119 (N.D.Miss.1963).

Today, more than a century after the enactment of the limitation statute, a court's imagination would have to be considerably extended to find any reason or justification for judicial reconstruction of that legislative intent, particularly since the economic situation of the insurance industry today is hardly analogous to that of American shipping in its infancy during the last century. Furthermore, to allow liability insurers to benefit from the limitation of liability statute by having their anticipated potential liability reduced to the amount of the limitation fund would inevitably cause the financial burden of the injuries and losses to be borne by the injured parties and their families. Such an inequitable result could hardly be judicially countenanced as "the administration of equity in an admiralty court," especially in view of the fact that the insurer always receives premiums for the full amount of coverage afforded by the standard liability insurance policy. In addition to this, there is the fact that since 1851 the practice of insuring all marine risks has come into being and has flourished both here and abroad. The cost of such insurance today is widely spread by the vessel owner to those who utilize the services of the ship, and the availability of insurance and the public's acceptance of its cost as an item of business overhead have certainly not discouraged private shipping. Also to be considered is the noticeable trend against the principle of limitation itself. In the recent case of In re Petition of The A. C. Dodge, Inc., 282 F.2d 86 (2 Cir. 1960), this trend was clearly reflected by the Second Circuit Court of Appeals in the following language:

"However, we think that ambiguous language in statutory provisions relating to limitation of liability should be resolved in favor of interpretations increasing the instances where full recoveries from the limiting vessel are possible." 282 F.2d at p. 89.

■ Having thus concluded that the insurer's liability is not to be affected by the limitation proceedings, the court now turns to consider the procedural effect of both the direct action and the limitation proceeding upon the shipowner's position. Since there is the indication that the regulation of marine insurance is to be governed by state law, Coleman v. Jahncke Service, Inc., 341 F.2d 956, 961 (5 Cir. 1965); Maryland Casualty Co. v. Cushing, 347 U.S. 409, 430, 74 S.Ct. 608, 98 L.Ed. 806 (1954); Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), the result indicated by the Louisiana Direct Action Statute is dispositive of this issue, provided, of course, that no offense be rendered to the harmony of national maritime law.[12] The Louisiana statute clearly indicates the intent that "all liability policies * * * are executed *for the benefit of all injured persons* * * * *to whom the insured is liable*; and that it is the purpose of all liability policies to give protection and coverage * * * for any legal liability said insured may have as or for a tortfeasor * * *." LSA–R.S. 22:655, as amended, Acts 1962, No. 471, § 1. (Emphasis added.)

■ Although the federal limitation of liability statute was promulgated for the benefit of shipowners, and the Louisiana Direct Action Statute was enacted for the benefit of those to whom, as in the

12. "The uniformity which the Admiralty Clause of the Constitution requires is limited to one indefinitely, defined area—that involving 'the essential features of an exclusive federal jurisdiction.' Just v. Chambers, 312 U.S. 383, 391, 668, [61 S.Ct. 687, 85 L.Ed. 903]. Except in instances falling clearly within this area states are free to make laws relating to maritime affairs." Cushing, supra, 347 U.S. at p. 430, 74 S.Ct. at p. 619.

present case, an insured may be liable, still no conflict need arise from a joint application of both. In order to protect the substantive interests incorporated in both statutes, the following procedural observations and guidelines are set forth.

First, the desirability and the attending benefits of a concursus proceeding, so zealously defended by Justice Frankfurter in Maryland Casualty Company v. Cushing, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954), should not be disregarded in cases such as these. Equally important is the desirability of confining the litigation of the claims against the shipowner and/or his insurer to a single forum. See, Ex parte Tokio Marine and Fire Ins. Co. (Ex parte Aetna Casualty and Surety Co.), 322 F.2d 113 (5th Cir. 1963). Then, to eliminate those procedural complications which might arise in a federal judicial district composed of several divisions (such as this one), once a petition for exoneration from or limitation of liability has been filed in cases such as this, and prior to the date that such petition is to be heard, counsel for any injured party can file a direct action in order to pursue those claims directly against the petitioner's (the shipowner's) insurer, and may then move for a consolidation of all proceedings.[13]

Whether the questions of fact in the direct action against the insurer are determined by a jury (if the proper jurisdictional requirements are met to invoke a civil proceeding), or whether they are determined by the court sitting in admiralty, the evidence presented in the direct action would suffice for a proper determination of the limitation proceeding in admiralty. The following alternatives may then arise:

I. If the policy limits be sufficient to satisfy the claims established in the direct actions, there the matter ends, and the limitation proceeding as concerns the direct action claimants would become moot.

II. Should the insurance coverage be insufficient to satisfy all the claims in the direct action aginst the insurer, then the court would proceed with the limitation hearing. Naturally, no attempt could be made to prove additional damages beyond those established in the direct action proceeding. 1 Moore's Federal Practice, ¶ 0.401 at p. 4022, and authorities cited therein.

A. If limitation is granted and the amount of the limitation fund exceeds the insurance coverage, then the fund would be credited with the insurance recovery, and the remainder would be distributed to the claimants in accordance with the amount and rank of the claims proven.

B. If limitation is granted, but the fund is less than the amount of insurance coverage, then the limitation fund is credited with the amount already recovered from the shipowner's insurer, and no further recovery would be allowed. In this way, the shipowner would be protected by his insurance to the same extent as he would be in any other jurisdiction, thus assuring uniformity in treatment of shipowners in all jurisdictions of the United States.

C. If no limitation of liability is granted, then the shipowner would be credited with the amount of damages recovered from the insurer in the direct actions, and then stand liable for the entire amount by which the proven damages exceed the insurance coverage.

Therefore, in the case at bar, the motion to restrain the direct action against the Scottish Union and National Insurance Company and the Stuyvesant Insurance Company is hereby denied, and all proceedings are to be consolidated in accordance with the procedure set forth herein.

## APPENDIX

The historical development of the concept of limitation of a vessel owner's liability was extensively treated by Ware, J., in the case of THE REBECCA, re-

13. Should claimants choose to institute direct actions in the state courts, certain procedures and problems may arise which are outside the scope of this opinion.

ported at 20 Federal Cases 373 (D.Ct. Maine 1831), Case #11,619. The following excerpts are taken from that analysis at pp. 376–377 and 378–379:

"The revival of commerce in the Middle Ages, when the first elements of the maritime law were in the process of formation, did not long precede the restoration of the study of the civil law, in the celebrated schools of Italy; and the equitable principles of that law could hardly fail of impressing themselves upon the maritime jurisprudence of the age.

"By the civil law,[14] the owner or exercitor was personally bound for all the acts of the master, falling within the range of his authority as master. Omnia enim facta magistri debet præstare, qui eum præposuit (Dig. 14, 1, 5); ejus rei nomine, cujus ibi præpositus fuerit, (Dig. 14, 1, 1, 7). He was responsible for the acts of the master, while engaged in the discharge of his functions as master, as well ex delicto as ex contractu. Aliquatenus culpæ reus est, quod opera malorum hominum uteretur, ideo quasi ex maleficio teneri videtur. (Inst. 4, 5, 3; Dig. 44, 7, 5, 6). If there were several exercitors, each was bound in solido for the full amount of the obligations of the master, arising ex contractu. (Dig. 14, 1, 1, 25; Dig. 14, 1, 2) But for obligations ex delicto, each was bound only for his part, that is, in proportion to the interest he had in the ship. Si plures navem exerceant unus quisque pro parte qua

navem exercent convenitur. (Dig. 14, 1, 1, 17). The common law of England and of this country, except so far as it has been altered by statute, follows the civil law, and holds the owners responsible for the acts of the master, unless he takes care to exclude his own liability. Hussey v. Christie, 9 East. 432.

"Perhaps it may be found, upon a critical examination of the origin and history of the maritime law, that to much has been ascribed to the influence of the Roman Law. Still many of its principles have been supposed to be derived directly from that law; but in adopting this principle of the responsibility of the owners for the acts of the master, if it were in fact derived from that source, most of the nations of Europe, if not all, with the exception of England, adopted it with an important qualification. They held the owners severally bound in solido for the acts of the master, whether of tort or contract, but limited the extent of their liability to the value of the ship. The creditors had always their remedy against the vessel, and through that, each owner was liable, but not beyond his share in the vessel. That this was the settled law of the Mediterranean is abundantly proved by the several chapters in the Consulate of the Sea [15] which governed the maritime commerce of all the ports of that sea. In chapter 239 it is said that if the master borrows money for the necessities of the ship, in a place where

---

14. Reference is here made to Roman Law, as incorporated in the Institutes of Gaius and in the Digests or Pandects enacted by Justinian. For a complete translation of the passages cited herein, see, The Civil Law, A Translation by S. P. Scott (1932 ed.); vols. 1–4.

15. The Consulate of the Sea is the celebrated collection of maritime customs and ordinances published in the latter part of the 15th Century at Barcelona, Spain. It contained the maritime laws

recognized at that time by the commercial judges (generally known as "consuls") in the ports along the Mediterranean coast. The French translation, apparently used by Judge Ware in his research, was published in the second volume of J. M. Pardessus's Collection des Lois Maritimes (circa 1830) under the title of "La Compilation connue sous le nom de Consulat de la Mer" (The Compilation known under the name of Consulate of the Sea).

the owners do not reside, the whole ship shall pay the loan, and no part owner can object. But if the ship is lost before the loan is paid, no part owner is bound to pay any thing. Let the lender then take care how he lends, for the owners lose enough in losing their shares. Again in chapter 186, if goods are lost or injured by being laden on deck without the consent of the shipper, and the master has not the means of paying, the ship shall pay. But the owners shall not be liable except for the amount of their shares in the ship. The same principle is again stated in chapter 227, in case of injury to goods by the want of proper apparel or rigging for the vessel. In the ordonnance of Peter III of Aragon, for the regulation of the consular jurisdiction of Valentia, making the forty-five first chapters of the common edition of the Consulate, it is said that when the master is unable to satisfy the obligation which he has contracted, the lender shall be paid by the shares of the part owners, but that the master has not authority to bind their other property without a special procuration in writing for that purpose. Consulate de la Mer, c. 34, Boucher's Translation. In the jurisprudence of the Consulate, in addition to the direct liability of the master himself, the vessel was tacitly hypothecated for the obligations contracted by him, both ex contractu and ex delicto, but there resulted from them no personal liability on the owners. 'In all damages which are here and shall be mentioned in the chapters of the sea, the master supports his part of what the ship pays, and each part owner his part, for the ship pays the whole.' Chapter 72. See also, cc. 58, 63, 94, 138, 193, 254, 289. The law of Holland has always limited the responsibility of owners in the same manner, and discharges them from all personal liability, upon their abandoning their interest in the ship to the creditors. Grotius says that the principle of the Roman law was never in force there, and he condemns it as both inequitable and injurious to the interest of trade. De Jure Belli et Pacis, liv. 2, cap. 11, § 13; Voet, ad Pand. liv. 14, 1, 15; Huber Prael. Jur.Civ.L. 14, 1, 19; Vinnius in Peckium, note p. 155. The law of Sweden is explicit, that if the owners choose to abandon the ship, the creditor can demand nothing more, nor touch their other property unless they have specially bound themselves, (Maritime Code of Charles II, 1667, pt. 1, c. 16) and the same limitation appears to be established by a statute of Hamburgh (Statute of 1603, tit. 18, art. 3; Kurike in Jus Marit. Hans, tit. 6, art. 2, p. 766). According to Emerigon, such is the established jurisprudence of the north of Europe. Contrats à la Grosse, c. 4, § 11.

"The Ordonnance de la Marine[16] provides that 'the proprietors of vessels shall be responsible for the acts of the master, but they shall be discharged by abandoning the ship and freight.' Liv. 2, tit. 8, art. 3. And this article was merely an affirmance of the pre-existing law. Cleriac, Navigation des Rivères, art. 15, p. 502. This celebrated ordonnance was formed upon all the previous maritime codes, ancient and modern, corrected, as is said, by particular information obtained at the time, of the actual maritime jurisprudence of all Europe, and in all

16. Judge Ware here refers to the famous Marine Ordinance of Louis XIV. This codification of the prevailing maritime regulations of France and other European states of that time was due largely to the efforts of Louis XIV's minister of finances, Colbert, and it was enacted by royal decree in 1681. For a complete translation, see, The Marine Ordinances of Louis XIV, 30 Federal Cases 1203 (1897).

questions in this branch of the law, has always been considered as of the highest authority. In such respect was it held on its first appearance, that Valin, in the preface of his Commentary, says that it became at once the universal law of maritime nations.

" * * * I think it may safely be affirmed that, by the general maritime law of Europe, the liability of owners for the wrongful acts of the master is limited to the interest they have in the ship, and that by abandoning the ship and freight to the creditor they discharge themselves from all personal responsibility. It may be added that the statute law of this state has affixed the same limitation to the owner's liability. 1 Laws Me. c. 14, § 8.

"If it be assumed as an established principle that, by the general maritime law, the responsibility of the owners for the acts of the master, is limited to the value of the vessel and freight, so far as his obligations arise ex delicto, for it is only so far that the doctrine is applicable to this case, and that by abandoning them to the creditor, they may withdraw themselves from their obligation, what is the natural consequence of the principle? Is it not to render the ship herself liable to the creditor in specie? So I understand the law, and such, as I understand it, is the doctrine of the books. Emerigon, in the chapter already quoted, says that the obligation of the owners is rather real than personal * * *."

* * * * * *

Judge Ware later continues his analysis of the history and nature of limitation as follows:

"The principle of the limitation of the responsibility of the owners for the acts of the master, together with the cognate rule, by which the ship is tacitly hypothecated for the obligations contracted by him when acting in the quality of master, and

within the scope of his authority as such, is entirely due to modern invention. No trace of it is to be found in the Digest of the Roman Law, not in the compilation which goes under the name of the 'Rhodian Law', a work which, though not entitled to the name which it has received, is undoubtedly a work of high antiquity, and of an earlier date than any of the maritime codes of western Europe. It originated in the maritime usages of the Middle Ages, and more particularly in the Mediterranean, where commerce first acquired activity and extension after the fall of the Western Empire. In Italy and the southern ports of France and Spain the custom seems to have been nearly coeval with the revival of maritime commerce. That it had its origin in the Mediterranean, and probably in Italy, the cradle of the modern law merchant, appears from the fact that no traces of it are to be found in the Laws of Oleron, a code earlier than the Consulate, at least in the form in which we now have it, and which constitutes the basis of the maritime law of the western parts of Europe; nor is there any indication of it in any of the earlier codes which were derived from this primitive compilation. It was at a later period that it extended to the western and northern ports of the Continent.

"Frémery, a French advocate, in a recent ingenious and learned work on commercial law, traces the origin of the custom to the contract of commande, commenda, or commendum, as it is variously written. Etudes de Droit Commercial, c. 27. By this contract, which constituted a sort of qualified partnership, or something between partnership and agency, a person having a capital which he wished to invest in commerce, might intrust it to a merchant or mariner for him to employ in trade, and to receive his compensation in a stipu-

lated share of the profits, and account to the lender for the principal and such portion of the profits as was agreed upon in the contract. It was a cardinal principle in the law of the contract, that the person who advanced the capital, although the commendatary stood to him in the relation partly of a partner and partly of an agent, and although he had a direct interest in his contracts, should not be personally liable for them. The contracts of the agent bound himself and the capital which the lender advanced, with all its increase from the profits of the trade, but nothing further. This form of contract was probably suggested by the extra perils attending on all commercial operations, in those ages of barbarism and disorder, and more particularly on those of maritime commerce. The profits of trade in those times were great and tempting, in proportion to the greatness of the risk, and by this contract men of capital were enabled to participate in these profits, without putting at hazard their whole property. It therefore had a direct and powerful influence in drawing out dormant capital, and putting it into a state of activity and by thus giving a new impulse and greater extension to commerce to render capital at once more productive to the owner and more beneficial to the community. This contract was the more important in maritime commerce, as the contract of insurance, which has so great an influence in giving extension to commerce in our time, was then unknown, that being an invention of later times. It was, in fact, in the primitive age of trade, one of the most powerful springs by which maritime commerce was carried on. It was highly favored and all the commercial codes of the time go more or less into detail in prescribing the rules and principles by which it was regulated and governed. We find them in the Assise of Jerusalem, cc. 41, 46; Pardessus, Collection des Lois Maritimes, pp. 272, 276, 280, established in the first years of the twelfth century. The Consulate of the Sea, besides other places in which the contract is incidentally mentioned, devotes eleven chapters (chapters 210–221) exclusively to the development of the principles by which it is regulated. See also the Statute of Marseilles of 1253, lib. 4, cap. 13; 4 Pardessus, 527.

"This contract being found to be so well adapted to the wants of society and to the hazards of commerce at the time, was not long in extending itself over the continent of Europe. It seems, however, never to have reached England, or at least never was adopted there as a general commercial custom. The British Islands have always been, to a considerable extent, insulated from the rest of Europe, in their customs and modes of thinking, as well as in their geographical position. Penitus toto divisos orbe Brittannos. It gradually fell into desuetude when, from the augmentation of commercial capital and the diminished dangers of commerce, it became less necessary in commercial operations; or rather it was superseded by another contract which was derived from it, that is, limited partnership, or société en commandité. But it is a contract which, in all countries and all ages, must have been more or less used, though it may not in all have been sufficiently, common to have acquired an appropriate name, or become an object of distinct consideration by legislators or jurists. In the law of France it is known under the name of 'contrat de pacotille,' and the principles by which it is governed appear to be well settled by the jurisprudence of the country. 1 Valin, sur Ord. de la Marine, 682–686, liv. 3, tit. 4, art. 2; Emerigon, Contrats à la Grosse, c. 1, § 5; Pardessus, Droit Commercial, part 3, tit. 3, c. 3. The principles of this con-

tract were applied by the legislation and jurisprudence of the Middle Ages to the master of a vessel. He was considered not precisely as the agent, or in the language of the civil law, the præpositus of the owners, but as standing with regard to them in a peculiar relation, which was expressed by the term commendatory. He had the control and management of the vessel, and, in the absence of the owners, was authorized to enter into all contracts which were necessary to its employment. His contracts bound himself, and operated a tacit hypothecation of the vessel. The creditor might pursue the master personally, or might proceed by the arrest of the vessel. But the owners were under no personal liability for the obligations of the master, arising either ex contractu or ex delicto. His contracts and torts bound their shares of the vessel, but bound them no further. The master had no authority to compromit their fortunes beyond the capital which they had intrusted to this administration. The Consulate of the Sea is perfectly explicit on this point. 'If the master has not property nor means to pay the damage of the merchants, and he can be arrested, he ought to be put into the hands of justice, as if he had taken the ship in commance; for every master is and ought to be held and considered as a commendatary in all engagements he shall enter into with merchants on account of the ship; and this for many reasons which it is unnecessary to explain in this place.' Edit. Pardessus, c. 295–250 [sic]. This is the view which seems to be taken of the subject by Emerigon, whose mind was profoundly imbued with the maritime usages and jurisprudence of the Middle Ages. 'The obligations of the proprietors,' he says, 'are rather real than personal. The captain, in the course of the voyage has the authority to borrow money for the necessities of the ves-

sel, upon her hull; he may pledge her apparel; he may sell part of the merchandise and cargo. And this is all he can do. His legal power does not extend beyond the ship of which he is the master, that is to say, the administrator. He cannot bind the other property of the owners unless they have given him a special authority for that purpose.' Contrats à la Grosse, c. 4, § 11.

"The custom which exempted the owners from personal liability for the acts of the master, extended, as has been observed, as well to obligations arising ex contractu as ex delicto. * * * *"

### On Rehearing

On motion of the vessel's underwriters, Scottish Union and National Insurance Company, and the Stuyvesant Insurance Company, a rehearing was granted on May 28, 1965, in order to consider whether the opinion heretofore rendered in this matter on April 15, 1965, should be recalled and vacated, or affirmed. Pursuant thereto a rehearing was held and further extensive argument was entertained by this Court on June 10, 1965. There was no valid or even persuasive argument against the substantive issues of law determined by the Court's previous decision, namely:

That the Limitation of Liability Statute, 46 U.S.C. § 181 et seq., created a defense personal in nature in favor of United States vessel owners which could not be urged by or in favor of the underwriters of the vessel owners.

As concerns some of the related procedural issues raised by petitioners on rehearing, this Court purposely has attempted to avoid the creation of fixed procedural patterns to be inflexibly applied in every possible situation which might be anticipated. Inasmuch as the basic substantive issues have been laid to rest, further necessary procedural adjustments will be made by the courts as each situation arises. For example, in the majority of those cases where there exists ample insurance coverage, the limi-

tation proceeding, in effect, will become moot. In the event that coverage should be insufficient to satisfy all claims, there are well-recognized methods to implement distribution of a limited insurance fund to multiple claimants.[1]

Therefore, it is the order of this Court that the motion to recall and vacate the previous opinion rendered by this Court on April 15, 1965, be and the same is hereby denied and the judgment rendered on April 15, 1965, is affirmed.

1. See 22 La.Law Review 214 (1961)